FELICIA PIEROT BRODY *v.* CARY BRODY
(AC 32197)

DiPentima, C. J., and Espinosa and Pellegrino, Js.

Argued January 30—officially released July 17, 2012

*Steven D. Ecker,* with whom, on the brief, were *Ann Walsh Henderson, M. Caitlin S. Anderson* and *Gavan F. Meehan,* for the appellant (defendant).

*Gary I. Cohen,* for the appellee (plaintiff).

ESPINOSA, J. The defendant, Cary Brody, appeals from judgments of the trial court rendered in connection with the underlying dissolution action awarding to the plaintiff, Felicia Pierot Brody, a $2.5 million lump sum alimony payment and granting the plaintiff's two postjudgment motions for contempt. The defendant claims that the trial court improperly (1) rendered its judgment dissolving the parties' marriage on the basis of a finding of infidelity that was not supported by sufficient evidence, (2) awarded alimony on the basis of conduct that was the subject of a prior written stipulation between the parties that released claims arising from this same conduct, (3) used an award of alimony to effectuate an improper distribution of property in violation of the parties' prenuptial agreement, (4) calculated the alimony award on the basis of cash flow rather than available net income, (5) found him in contempt on the basis of his compliance with a prior federal court order and (6) found him in contempt by applying the wrong standard of proof. We affirm the judgments of the trial court.

The following facts as found by the trial court are relevant to our resolution of this appeal. The parties met in 1997 and started dating shortly thereafter. The plaintiff was a securities trader and was engaged in the business of "flipping" initial public offerings of securities. The defendant had worked for two different hedge funds, and, in 1998, he started his own hedge fund, named Colonial Fund, LLC (fund). The plaintiff assisted the defendant in establishing the fund, making an initial investment of $250,000, loaning the fund $600,000 for working capital and introducing her brother, an investor, to the defendant. At its inception, the fund had approximately $3 million under its management.

In the fall of 1998, the defendant, the plaintiff and her three children moved into a rental home on Lindsay

Drive in Greenwich (Lindsay Drive property). In April, 1999, the parties purchased the Lindsay Drive property for $2,656,265.49, sharing equally the costs of acquisition, renovation and related household expenses. In April, 2000, the parties decided to marry. The parties negotiated and signed a prenuptial agreement, under which they retained their separate assets as disclosed on financial statements that were attached to the prenuptial agreement. At the time of their marriage, the defendant's net worth was approximately $46 million and the plaintiff's net worth was approximately $29 million. On April 29, 2000, the parties were married in Provence, France.[1]

In 2002, the parties listed the Lindsay Drive property for sale and jointly purchased a home on Husted Lane in Greenwich (Husted Lane property) for $5,950,000. Their first child was born in September, 2002. The defendant expressed to the plaintiff that he did not want her to be employed because, as the president of his company, it "did not look good" for her to be so employed. Furthermore, the defendant stated that he did not want the plaintiff's employees walking through the parties' home and that it was "no longer an option" for the plaintiff to continue working. Accordingly, the parties agreed that the plaintiff would close her business and focus on raising the children and maintaining the household and that the defendant would pay the family's expenses. Pursuant to the agreement, the plaintiff continued to have her agents make discretionary trades of securities and her separate assets on her behalf, from which trading she received dividend income of approximately $100,000 per year.

[1] Although there was no claim at trial or on appeal that the court lacked subject matter jurisdiction over the marriage, we observe that the court found that one of the parties continually had resided in Connecticut for more than one year prior to the commencement of the present litigation. See General Statutes § 46b-44 (c) ("[a] decree dissolving a marriage . . . may be entered if: [1] One of the parties to the marriage has been a resident of this state for at least the twelve months next preceding the date of the filing of the complaint or next preceding the date of the decree").

After acquiring the Husted Lane property, the defendant voluntarily funded essentially all of the household's common expenses. The parties enjoyed a comfortable lifestyle fueled by the defendant's successes at work, and they had a second child. Between 2003 and 2004, the plaintiff made investments totaling $2,650,000 in the fund on behalf of herself and her children.

During this time, however, the parties began discussing what the plaintiff perceived as the excessive spending of the defendant. Between 2005 and 2008, the plaintiff expressed to the defendant her unhappiness with his purchases of two airplanes, a wine cellar costing in excess of $100,000 and Ferrari automobiles. The defendant was drinking alcoholic beverages more than he had earlier in the marriage, and he was becoming verbally abusive of the plaintiff. From 2007 to 2008, the defendant continued to be verbally abusive of the plaintiff and started to become aggressive sexually with her. The plaintiff made it clear to the defendant that she was unhappy with his behavior, but the defendant was unreceptive to her concerns.

Unknown to the plaintiff, the defendant's income had started to decline in 2005. In 2007, the defendant's partner in the fund called the plaintiff to inform her of significant losses in the fund and of hidden trades engaged in by the defendant. In October, 2007, the plaintiff learned, when it was announced publicly, that the Securities and Exchange Commission was prosecuting the fund and the defendant personally. The defendant had been aware of this investigation since July, 2003, but he had not told the plaintiff about it. The defendant assured the plaintiff that she did not have to worry, and the plaintiff continued to support the defendant. In May, 2008, the defendant accepted delivery of a new Ferrari.

The defendant was served with divorce papers on July 1, 2008. At the time of trial, the plaintiff was carrying a net operating loss of $2 million. In a memorandum of decision issued March 12, 2010, the court, *Munro, J.*, ordered, among other things,[2] the dissolution of the parties' marriage. In connection with the dissolution judgment, the court ordered the defendant to pay the plaintiff $2,500,000 in lump sum alimony, to be paid as follows: $1 million on or before June 1, 2010, $1 million on or before June 1, 2011, and $500,000 on or before June 1, 2012. The defendant appealed from that judgment on April 30, 2010. Additional facts will be set forth as necessary.

I

FINDING OF INFIDELITY

The defendant claims that the court's judgment must be reversed because, according to him, it was based in part on a finding of infidelity that was not supported by sufficient evidence. The defendant notes three points in the court's memorandum of decision where the court mentions infidelity and asserts that it is clear that, on the basis of these statements, the court found that he had been unfaithful in his marriage to the plaintiff. He argues that, as a matter of law, this finding of infidelity was not supported by sufficient evidence. Furthermore, he asserts that, because this finding formed an essential basis of the court's decision, this error requires reversal and a new trial. We are not persuaded.

The following additional facts found by the court are relevant to this claim. In June, 2008, the plaintiff discovered unused condoms in the defendant's toiletries bag when he returned from a five day trip to California. According to the plaintiff's testimony, the defendant

---

[2] Prior to trial, the parties stipulated to a custody agreement and a parenting plan, both of which were accepted by the court. Therefore, the court's decision determined only financial matters.

had not used condoms in the marriage for the past three years. The court credited this testimony, rejecting as not credible the defendant's various assertions that he used the condoms in the marriage when his sexually transmitted disease was active and that he used the condoms for comfort when he had ingrown hairs. The court found that the presence of condoms in the defendant's toiletries bag was a sufficient basis for the plaintiff reasonably to believe that the defendant had been unfaithful to her. The court stated: "The court finds that the presence of condoms in his [toiletries bag] was a sufficient basis for the plaintiff to presume he was unfaithful to her. Further, the court having found him not credible on this regarding a substantial statutory factor, cause of the breakdown of the marriage, which the court must consider in weighing alimony claims. Further, the court considers this lack of credibility a substantial adverse factor where it is weighing the differing testimony of the parties and credibility is an issue."

The court observed that the defendant's credibility was damaged further by its finding that he had lied under oath in a prior dissolution proceeding. The plaintiff commenced an action for dissolution of marriage after an incident on October 31, 2000, but withdrew the action several weeks later, after the parties reconciled. During the pendency of the dissolution proceeding and while the parties were separated, however, the defendant removed the plaintiff's jewelry from the safe in the Lindsay Drive property. The defendant testified during the dissolution proceeding that he had not removed the jewelry, although he later admitted that he had. The court in the present case found that the defendant lied under oath at that proceeding and found that this had a negative impact on his credibility as a witness in the present proceeding.

Later in its memorandum of decision, the court addressed the defendant's failure to produce certain financial records detailing advances against his trading allocations that he took from the fund. The court reviewed what it considered obstructionist tactics on the part of the defendant, stating that "[t]he defendant has intentionally and consistently sought to avoid disclosure of [the fund's] soft dollar information in this action." The court noted that, beyond failing to produce financial records, the defendant had tried to block discovery in the present action. One month after the plaintiff filed for dissolution of the parties' marriage, the fund, represented by the defendant's sister, attorney Lara Brody, brought an action against the defendant in New York in an attempt to prevent the defendant from submitting to the Connecticut court certain financial documents of the fund. In June, 2009, Lara Brody signed a retainer agreement with the defendant personally. She claimed that she had not provided the defendant with any legal advice in connection with the divorce proceedings.

The court determined that, under the totality of the circumstances, the defendant was not credible. It stated: "The defendant's problem with telling the truth continued throughout this proceeding. The defendant admitted that while in the Stamford Superior Court in September, 2008, he testified, under oath, that the plaintiff was not an investor in [the fund]. This is the same person who took the plaintiff's jewelry in the first dissolution [action] and lied on the witness stand, at that time, in Stamford Superior Court. The sanctity of an oath of honesty is apparently of little importance to the defendant. The marital vow of fidelity proved no more binding on [the defendant]."

Additionally, the court determined that the defendant improperly and intentionally had failed to disclose reports detailing any expenses related to travel, food,

transportation or entertainment. The court did not credit the defendant's assertion that no such expense reports existed. The court concluded: "The marriage between the parties has broken down irretrievably, in large part because of the defendant's dishonesty, probable infidelity and his increasingly abusive behavior toward the plaintiff. The defendant failed to comply in a timely manner with the plaintiff's discovery requests. The defendant withheld material information and made inaccurate statements of fact in his various responses to the plaintiff's requests for production of records. . . . The defendant's various attempts to stonewall and prolong the discovery process in the matrimonial proceedings forced the plaintiff to expend far more on legal fees than she should have."

"An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record or as a whole. . . . A finding of fact is clearly erroneous when there is no evidence to support it . . . or when although there is evidence in the record to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . A fundamental principle in dissolution actions is that a trial court may exercise broad discretion in awarding alimony and dividing property as long as it considers all relevant statutory criteria. . . . This standard of

review reflects the sound policy that the trial court has the opportunity to view the parties first hand and is therefore in the best position to assess all of the circumstances surrounding a dissolution action, in which such personal factors such as the demeanor and the attitude of the parties are so significant." (Citation omitted; internal quotation marks omitted.) *Wiegand* v. *Wiegand*, 129 Conn. App. 526, 529–30, 21 A.3d 489 (2011).

General Statutes § 46b-40 (c), laying out the statutory grounds on which a court may render a judgment of dissolution of marriage, provides in relevant part: "A decree of dissolution of a marriage . . . shall be granted upon a finding that one of the following causes has occurred: (1) The marriage has broken down irretrievably . . . (3) adultery . . . ."

The court's judgment was not made on the basis of a finding of infidelity. Rather, the court explicitly found that the marriage had broken down irretrievably, and this was the statutory ground for dissolution listed on the judgment file. The court listed the defendant's dishonesty, extravagant spending, excessive drinking and abusive behavior toward the plaintiff as factors that contributed to the breakdown of the marriage. To the extent that the court referenced the incident during which the plaintiff found unused condoms in the defendant's toiletries bag, it is clear that the court merely was reviewing another cause of the breakdown of the marriage, in this instance, the plaintiff's belief that the defendant had been unfaithful to her. This reading of the court's decision is supported further by the court's later reference to "the defendant's dishonesty, probable infidelity and his increasingly abusive behavior toward the plaintiff" as factors that contributed to the breakdown of the marriage. The only other point at which the court mentioned infidelity—in the course of reviewing the defendant's repeated noncompliance

with the plaintiff's discovery requests for various financial records—does not lend any support to the defendant's argument to the contrary. On the basis of the entire record, there is no support for the defendant's contention that the court made a finding of infidelity. Accordingly, the defendant's claim necessarily fails because it presumes that the court made such a finding.

## II

### ALIMONY AWARD

The defendant claims that the court's lump sum alimony award to the plaintiff was improper on several grounds. Specifically, the defendant claims that the court improperly (1) awarded alimony on the basis of conduct that was the subject of a prior written stipulation between the parties that released claims arising from this same conduct; (2) used an award of alimony to effectuate an improper distribution of property in violation of the parties' prenuptial agreement; and (3) calculated the alimony award using cash flow rather than available net income. We address each of these claims in turn.

### A

### Prior Written Stipulation

First, the defendant claims that the court improperly awarded alimony on the basis of conduct that was the subject of a prior written stipulation between the parties that released claims arising from this same conduct. The defendant argues that the parties signed a written stipulation settling in all respects a dispute regarding the plaintiff's investment in the fund. Specifically, he maintains that the stipulation released him from "any and all claims" arising out of the plaintiff's investment in the fund. He argues that this includes claims of alimony and that the court improperly considered the very conduct addressed by the stipulation in determining the amount of alimony to award to the plaintiff. We disagree.

The following additional facts are relevant to our consideration of this claim. In May, 2008, the plaintiff's brothers, who had invested in the fund, requested redemption of their investments. The fund informed them that, as of June 1, 2008, the fund had implemented a "30-70 holdback." Pursuant to this holdback, if an investor attempted to redeem, that investor would receive only 30 percent of the investment; 70 percent would remain in the fund pending the conclusion of the litigation with the Securities and Exchange Commission. This was the first time that the plaintiff learned of the holdback, which also affected her investments in the fund that she had made on behalf of herself and her children.

On December 11, 2008, the plaintiff filed a statement of claim and demand for arbitration in New York against the defendant in his personal capacity; the fund; Colonial Asset Management, LLC (managing company), the company that manages the fund and pays for its expenses; Colonial Investment Management, LLC, the managing member of the fund; and Colonial Asset Management Advisers, Inc., the managing member of Colonial Investment Management, LLC. The statement of claim asserted that the defendant's wrongful conduct and breaches of his fiduciary duties in managing the fund caused the plaintiff's investments to be at risk and demanded that the plaintiff be allowed to withdraw the full amount of these investments, not subject to the holdback.

The parties agreed to settle this dispute rather than proceed with arbitration and signed a stipulation in settlement of the plaintiff's claims. The stipulation provided in relevant part: "[The plaintiff] hereby releases Colonial Investment Management (CIM), Colonial Asset Management Advisers (CAMA), and [the fund] and [the defendant] from any and all claims *arising out of [the plaintiff's] investment in [the fund]* prior to July 17, 2009." (Emphasis added.)

For purposes of this claim, the defendant can demonstrate that the court improperly ordered the alimony award only if he can demonstrate that a prior contractual agreement of the parties was controlling. Thus, the defendant's claim presents a question of contractual interpretation over which our review is plenary. "[A] release, being a contract whereby a party abandons a claim to a person against whom that claim exists, is subject to rules governing the construction of contracts. . . . The intention of the parties, therefore, controls the scope and effect of the release, and this intent is discerned from the language used and the circumstances of the transaction." (Internal quotation marks omitted.) *Muldoon* v. *Homestead Insulation Co.*, 231 Conn. 469, 482, 650 A.2d 1240 (1994).

"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Citation

omitted; internal quotation marks omitted.) *Niehaus* v. *Cowles Business Media, Inc.*, 263 Conn. 178, 188–89, 819 A.2d 765 (2003).

We conclude, on the basis of our review of the plain language of the stipulation, that the stipulation unambiguously releases only those claims arising out of the plaintiff's investment in the fund. It does not encompass a claim for alimony, which arises out of the marriage and subsequent dissolution proceeding. The stipulation does not mention alimony despite the fact that the parties agreed to the stipulation on July 14, 2009, well after the plaintiff had initiated the dissolution proceeding. Clearly, if the parties intended to release the plaintiff's claim to alimony in the dissolution proceeding, they could have drafted the stipulation to make such a release. They did not. Rather, they drafted a stipulation that released claims "arising out of [the plaintiff's] investment in [the fund] . . . ."

Our conclusion that the stipulation releases only claims arising out of the plaintiff's investment in the fund is supported by reading the stipulation in light of the circumstances under which it was drafted. The stipulation was drafted in connection with an arbitration proceeding that was separate and distinct from the dissolution action and that dealt with different issues than did the dissolution action. The plaintiff's claims in the arbitration proceeding stemmed from the defendant's alleged misconduct and breaches of his fiduciary duties in managing the fund. The plaintiff named several defendants in her demand for arbitration, including the fund and other related corporate entities. The very clause that the defendant argues released him from any claim that the plaintiff had to alimony also released the fund and Colonial Investment Management, LLC. It is contrary to the plain language of the stipulation, especially in light of the circumstances attending its drafting,

to suggest that it released the plaintiff's claim to alimony.[3]

## B

## Distribution of Property

Next, the defendant claims that the court improperly used the award of alimony to effectuate an improper distribution of property in violation of the parties' prenuptial agreement. The defendant argues that, in the event of a divorce, the parties' prenuptial agreement expressly prohibits any transfers of assets from one party to the other unless that party's net worth is greater than it was at the time of the marriage. He asserts that, because his net worth does not exceed his premarital net worth, the plaintiff is not entitled to any of his assets. Furthermore, he argues that his current, disposable net income is not sufficient to pay the alimony award ordered by the court, and, therefore, the award constitutes an impermissible requirement that he transfer his property to the plaintiff. We do not agree.

"A fundamental principle in dissolution actions is that a trial court may exercise broad discretion in awarding

[3] Additionally, the defendant argues that the plaintiff's counsel conceded at trial that the court could not consider in awarding alimony any conduct subject to the release in the stipulation. The defendant suggests that this concession is particularly apparent upon reviewing the following colloquy between the court and the plaintiff's counsel, which colloquy occurred at a hearing on a postjudgment motion for contempt:

"The Court: That's not how I understood [the] argument [of the defendant's counsel]. I understood his argument to say that the court was not allowed to consider what happened in the entire investment of [the plaintiff] in [the defendant's] businesses when alimony was ordered because the two [$835,000] payments extinguished all claims she had—

"[The Plaintiff's Counsel]: I don't argue with that. If that's the intent, Your Honor, I don't disagree with that."

We are not persuaded that the plaintiff's counsel conceded that the plaintiff was not entitled to alimony. Rather, it appears that the plaintiff's counsel was agreeing with the court's characterization of the defendant's counsel's argument regarding the scope of the stipulation.

alimony and dividing property as long as it considers all relevant statutory criteria." (Internal quotation marks omitted.) *Lynch* v. *Lynch,* 135 Conn. App. 40, 45, 43 A.3d 667 (2012). "An appellant who seeks to reverse the trial court's exercise of judicial discretion assumes a heavy burden. . . . Decision making in family cases requires flexible, individualized adjudication of the particular facts of each case. . . . Trial courts have a distinct advantage over an appellate court in dealing with domestic relations, where all of the surrounding circumstances and the appearance and attitude of the parties are so significant. . . . Nothing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference." (Internal quotation marks omitted.) *McRae* v. *McRae,* 129 Conn. App. 171, 177, 20 A.3d 1255 (2011).

General Statutes § 46b-82 (a) provides in relevant part: "In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall hear the witnesses, if any, of each party, except as provided in subsection (a) of section 46b-51, shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment."

"[T]he purpose of alimony [is] the obligation of support that spouses assume toward each other by virtue of the marriage. . . . This court has stated that [a]limony is always represented by money and is damages to compensate for loss of marital support and maintenance. . . . In other words, alimony represents the court's finding, measured in dollars, of the financial

needs of the receiving spouse at the time of the dissolution." (Internal quotation marks omitted.) *Wiegand* v. *Wiegand*, supra, 129 Conn. App. 535–36. "By contrast, [t]he purpose of a property division pursuant to a dissolution proceeding is to unscramble existing marital property in order to give each spouse his or her equitable share at the time of dissolution." (Internal quotation marks omitted.) *Dombrowski* v. *Noyes-Dombrowski*, 273 Conn. 127, 133, 869 A.2d 164 (2005).

We conclude that the court did not abuse its discretion in awarding the plaintiff lump sum alimony. The court stated that the award reflected the fact that the plaintiff was not likely to earn as much as the defendant following the dissolution and that the parties had agreed that the plaintiff would focus on raising their children instead of working full-time. The court noted that the parties had enjoyed a comfortable lifestyle during their marriage and that, for the benefit of the plaintiff and the parties' children, any award of alimony should reflect this quality of life. Furthermore, the court emphasized that it was the defendant's conduct that led to the breakdown of the marriage. Citing § 46b-82, the court explicitly took all of these factors into consideration when fashioning the alimony award. We conclude that the award is consistent with the purpose of alimony and that the court properly considered the facts before it within the appropriate statutory framework. The defendant may elect to pay the award out of his separate assets, but how he chooses to satisfy his obligation under the court's order is his decision. The court did not order him to pay the award out of his separate assets. That he plans to do so does not invalidate an otherwise valid award of alimony.

The defendant argues that the court's requirement that he transfer to the plaintiff his interest in the Husted

Lane property as security for the alimony award constitutes an impermissible transfer of legal title of his separate assets to the plaintiff. He asserts that the Husted Lane property is part of his premarital net worth under the parties' prenuptial agreement and that, accordingly, any order transferring his interest to the plaintiff is improper. This argument is without merit.

The parties' prenuptial agreement provides: "The parties knowingly and voluntarily agree that if a termination event occurs, all premarital net worth will remain the asset or debt of its separate owner and will not be considered marital net worth subject to distribution by a court under any circumstances whatsoever. The parties hereto waive, discharge and release any and all claims, demands, rights and interests to and are hereinafter precluded from seeking from each other a division or assignment of the other party's premarital net worth as defined herein. It is the intention of the parties that the disposition of premarital net worth in this Agreement be deemed a disposition of property which would fully satisfy any claims which each party may have against the premarital net worth of the other under the laws of any jurisdiction including their rights to equitable distribution under [General Statutes §] 46b-81 and that the parties hereby specifically waive any equitable distribution with respect to the premarital net worth of the other."

Nothing in the parties' prenuptial agreement prevented the court from ordering that the Husted Lane property would serve as security for the court's alimony award under § 46b-82. The prenuptial agreement, by its clear terms, is concerned with equitable distributions of property under § 46b-81, not alimony awards. The court was free to order, within its broad discretion to make alimony awards, that the defendant's interest in the Husted Lane property would serve as security for his alimony obligation. See *Stein* v. *Hillebrand*, 240

Conn. 35, 41, 688 A.2d 1317 (1997) ("[The] provisions [of § 46b-82] were adopted in response to concerns that former spouses were frequently avoiding their alimony and support obligations. . . . To interpret the security language in § 46b-82 to exclude real property would, therefore, defeat the remedial purpose of this legislation by removing a stationary, valuable, and ascertainable form of property from the class of available security. This we decline to do." [Citation omitted.]). Accordingly, we reject the defendant's claim.

C

Calculation of Alimony

Finally, the defendant claims that the court improperly calculated the alimony award on the basis of cash flow rather than available net income. He argues that, accepting the court's calculation of his net income as accurate, he will not be able to pay his alimony obligation. We are not persuaded.

The following additional facts as found by the court are relevant to this claim. The defendant is a managing partner of the fund, the managing company and various other hedge funds. The defendant receives a yearly salary of $250,000 from the managing company, and he also receives an incentive fee when the fund is performing above a certain level. He can take advances from the fund against his monthly trading. Between 2004 and 2008, in addition to his salary from the managing company, $7,114,000 was transferred directly from the fund into his personal bank accounts. The financial records submitted at trial did not reveal whether this amount reflected withdrawals of the defendant's capital account, loans from the fund, salary or profit sharing.

The managing company takes advances from the fund. Between January 1, 2008, and the time of trial, the managing company had taken approximately $2

million in advances from the fund to cover the fund's various expenses, including meals and entertainment, fish tank maintenance and travel expenses. The defendant and his partner in the fund determine how much money the managing company spends.

The defendant receives health care and other benefits as an employee of the fund, including the use of a driver, who provides both professional and personal services. The defendant did not disclose the value of these various benefits. Additionally, the defendant has a credit card through the managing company, on which he charges both business and personal expenses. He charged $1,693,000 in personal expenses to this credit card between 2004 and 2008 and $93,840 in personal expenses to it between January 1, 2009, and July 31, 2009. These charges were made in addition to the salary that he received from the managing company.

Between 2003 and May, 2009, the fund earned between $25 million and $27 million in gross soft dollar commissions,[4] of which commissions $11 million were paid directly to the managing company. The defendant could not prove, however, what the managing company did with these soft dollar commissions. An expert for the plaintiff testified that, on the basis of the fact that the defendant had an $8 million loan balance on the fund's 2007 audited financial statement, it was more likely than not that these soft dollar funds were paid directly to the defendant. The court found the expert credible and credited his testimony. The court also found that, as of May, 2009, the managing company had $2,600,000 in soft dollar credits available and that the defendant had the power to distribute this money. Despite the plaintiff's repeated requests for production of the managing company's ledger, the defendant

[4] There was undisputed testimony at trial that a soft dollar commission is a rebate on commissions paid to a brokerage firm for securities trades.

refused to produce it. As a result, it could not be shown during trial what happened to this $2,600,000 in soft dollar credits.

The defendant's taxable income in 2003 exceeded $1,700,000. In 2004, his taxable income exceeded $8 million. Between August 31, 2008, and June 30, 2009, his net allocable income was approximately $615,000—this figure is in addition to his $250,000 salary from the managing company and withdrawals that the defendant makes from the fund. Between January 1, 2009, and July 31, 2009, the defendant withdrew $300,000 from the fund, and there was testimony at trial that, if the number included withdrawals made in August, 2009, the number would rise to $650,000.

On the basis of these facts, the court found that it was impossible to determine precisely the defendant's present earnings. The court found that the defendant knowingly and improperly asserted that various financial records requested by the plaintiff did not exist when in fact they did. Noting that the defendant had not altered considerably his lifestyle over the course of the marriage or since, the court found that the defendant had access to financial resources sufficient to maintain the lifestyle of the parties and their children as established by the parties during their marriage.

"[T]he trial court may under appropriate circumstances in a marital dissolution proceeding base financial awards on the earning capacity of the parties rather than on actual earned income. . . . Earning capacity, in this context, is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health. . . . [I]t also is especially appropriate for the court to consider whether the defendant has wilfully restricted his

earning capacity to avoid support obligations . . . . Moreover, [l]ifestyle and personal expenses may serve as the basis for imputing income where conventional methods for determining income are inadequate." (Internal quotation marks omitted.) *Auerbach* v. *Auerbach*, 113 Conn. App. 318, 334–35, 966 A.2d 292, cert. denied, 292 Conn. 901, 971 A.2d 40 (2009).

"[O]ur Supreme Court has emphasized the importance of using an expansive definition of income when formulating financial orders during the course of marriage dissolution proceedings. . . . Adopting a flexible definition of income, the court has explained, ensures that each spouse fulfills his or her continuing duty to support one another and each receives his or her equitable share of the marital assets. . . . Moreover, [w]here a party through his own wrongful conduct limits the financial evidence available to the court, that party cannot complain about the resulting calculation of a monetary award." (Citations omitted; internal quotation marks omitted.) *Brown* v. *Brown*, 130 Conn. App. 522, 527–28, 24 A.3d 1261 (2011).

The court, faced with the defendant's wrongful refusal to produce financial records that the plaintiff had requested, properly looked to other evidence of the defendant's income, namely, his expenses and his lifestyle. The court noted that the defendant's spending and lifestyle had not changed significantly throughout the course of the marriage. These were appropriate factors to weigh in determining, in the absence of conventional methods of calculating income, the proper amount of alimony to award. We conclude that the court did not abuse its discretion in its calculation of the amount of the plaintiff's alimony award.

## III

## CONTEMPT FINDINGS

The defendant claims that the court improperly found him in contempt on two separate occasions following

the dissolution judgment. First, the defendant claims that, on November 29, 2010, the court, *Munro, J.*, improperly found him in contempt on the basis of his compliance with a prior federal court order. Second, the defendant claims that, on April 28, 2011, the court, *Wenzel, J.*, improperly found him in contempt of the remedial order made in connection with the November 29, 2010 finding of contempt.

"The abuse of discretion standard applies to a trial court's decision on a motion for contempt. . . . A finding of contempt is a question of fact, and our standard of review is to determine whether the court abused its discretion in [finding] that the actions or inactions of the [party] were in contempt of a court order. . . . To constitute contempt, a party's conduct must be wilful. . . . Noncompliance alone will not support a judgment of contempt. . . . We review the court's factual findings in the context of a motion for contempt to determine whether they are clearly erroneous. . . . A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . The resolution of conflicting factual claims falls within the province of the trial court. . . . The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A reviewing authority may not substitute its findings for those of the trier of the facts." (Internal quotation marks omitted.) *Oldani* v. *Oldani*, 132 Conn. App. 609, 625–26, 34 A.3d 407 (2011).

Each finding of contempt relates to distinct conduct on the part of the defendant and is the basis of unique claims on appeal. Accordingly, we will address each finding of contempt separately.

A

## November 29, 2010 Contempt

The defendant claims that, on November 29, 2010, the court improperly found him in contempt on the basis of his compliance with a prior federal court order. Specifically, he argues that the court, *Munro, J.*, found him in contempt for conduct that was necessary to comply with a prior judgment that the Securities and Exchange Commission (commission) had obtained against him in federal district court. He asserts that he was put in the impossible position of either not satisfying the prior judgment in favor of the commission or being found in contempt of an ex parte restraining order that the court, *Malone, J.*, issued in connection with the dissolution judgment. We disagree.

The following additional facts as found by the court are relevant to this claim. On July 7, 2009, the commission obtained a judgment in the amount of $1,330,054.32 against the defendant in New York federal district court. See *Securities & Exchange Commission* v. *Colonial Investment Management, LLC*, 659 F. Sup. 2d 467, 503 (S.D.N.Y. 2009), aff'd, 381 Fed. Appx. 27 (2d Cir. 2010). This judgment was disclosed to the court during the dissolution proceeding. On September 3, 2010, the court, *Malone, J.*, granted the plaintiff's postjudgment motion for an ex parte restraining order. The order provided in relevant part: "That the [d]efendant is enjoined and restrained from spending, giving away, dissipating, pledging or in any other way, impairing his interest in any asset disclosed on his September 2, 2010 financial affidavit, including, but not being limited to, interests in investment accounts (including [the fund]), private placement partnerships, jewelry, wine, or other personal property or any other asset whatsoever, unless the [d]efendant first secures the permission of the

[p]laintiff or an order of the court permitting him to invade or dispose of an interest in any such asset."

On October 12, 2010, the plaintiff filed a postjudgment motion for contempt. The motion alleged that, in response to the judgment in favor of the commission, the defendant transferred approximately $250,000 from his personal account in the fund to an account for Colonial Investment Management, LLC. After a hearing, the court, *Munro, J.*, granted the motion for contempt in a written order issued November 29, 2010. The order stated in relevant part: "[T]he court finds that the defendant violated the restraining order by transferring funds to facilitate the payment of his court ordered obligation to the . . . [c]ommission pursuant to a judgment entered against him. The defendant argues that his conduct was not contemptuous. Indeed it was. The defendant was subject to a clear and unambiguous order that he could comply with by doing nothing. Instead he made a transfer to facilitate the payment of a creditor he deemed more of a priority than the plaintiff. While one could argue it was a [Hobson's] choice that the defendant faced, it was still in clear and wilful violation of the injunctive order issued by Judge Malone. Whichever burden of proof is applied, the plaintiff has satisfied it: by clear and convincing evidence this contempt is proven." The defendant amended his appeal to include a challenge to this decision on December 20, 2010.

We conclude that the court did not abuse its discretion in finding the defendant in contempt for transferring funds from his account with the fund to the Colonial Investment Management, LLC, account. As an initial matter, if the defendant believed that it was necessary to transfer the funds in order to comply with the judgment rendered for the commission, the restraining order provided him with the appropriate procedure for doing so: by an application seeking the permission of the court. Nothing prevented the defendant from requesting the

court's permission to transfer the funds at issue, but he failed to do so.

Furthermore, this transfer was not required to comply with the judgment of the District Court. As that court noted in its decision on the commission's motion to compel disbursement of the funds from the Colonial Investment Management, LLC, account: "Having deposited the sum in the [Colonial Investment Management, LLC] JPMorgan checking account, the asset is now in the hands of JPMorgan, not [the defendant]. . . . A turnover order from this Court would not compel [the defendant] to do anything; it would compel JPMorgan to turn over the funds in the Account. Whether [the defendant] has violated the Connecticut order by moving money into the Account is not for this Court to decide, nor is it determinative of whether to order a turnover. If suffices that requiring JPMorgan to turnover the asset would not violate the Connecticut order." (Citations omitted.) *Securities & Exchange Commission* v. *Colonial Investment Management, LLC*, United States District Court, Docket No. 07 Civ. 8849 (PKC) (S.D.N.Y. October 6, 2010). Nevertheless, the defendant took the affirmative step of transferring the funds out of an account to which the restraining order applied, admittedly out of a wilful attempt to prevent the plaintiff from receiving these funds rather than the commission. The court did not abuse its discretion in finding that this wilful violation of the restraining order was an adequate basis for a finding of contempt.

B

April 28, 2011 Contempt

Next, the defendant claims that, on April 28, 2011, the court improperly found him in contempt of its remedial order made in connection with the November 29, 2010 finding of contempt. Specifically, he argues that, in the April 28, 2011 finding of contempt, the court, *Wenzel,*

*J.*, applied the preponderance of the evidence standard of proof when it should have applied the heightened clear and convincing evidence standard of proof. Although this court previously has stated, on several occasions, that the preponderance of the evidence standard applies in the civil contempt context, the defendant asserts that these statements have been made in dicta and can be traced back to an erroneous interpretation of *Baldwin* v. *Miles*, 58 Conn. 496, 20 A. 618 (1890). We are not persuaded.

The following additional facts as found by the court are relevant to our consideration of this claim. As a remedial measure for its November 29, 2010 finding of contempt, the court provided: "The plaintiff is entitled to a reasonable attorney's fee for prosecuting this motion and shall submit an affidavit for the same within [twenty-one] days. Within [twenty-one] days, the defendant shall inventory all of the watches and all of the wine at his residence, or in his possession or control, and turn over the inventory to the plaintiff. The defendant shall cause all of the same to be delivered to such location as the plaintiff designates at his cost for her to safe keep [pending] appeal; said sum shall be held as security for sums due her under the court's decision until further order of the court."

In a postjudgment motion for contempt dated January 27, 2011, the plaintiff alleged that, while retrieving the parties' children from the defendant's home, she observed that the defendant was wearing a gold A. Lange & Sohne watch. The plaintiff's motion asserted that the defendant previously had testified, in connection with the court's November 29, 2010 finding of contempt ordering him to turn over his watches to a third party custodian, that he no longer had possession of this watch. The plaintiff maintained that the court should find the defendant in contempt for his failure to deliver this watch to the custodian designated by

the plaintiff. After a hearing on this motion, the court, *Wenzel, J.*, found the defendant in contempt in an order issued April 28, 2011. The court explicitly employed the preponderance of the evidence standard of proof in reaching its conclusion. The defendant amended his appeal to include a challenge to this decision on May 9, 2011.

"A finding of contempt is a question of fact . . . and our standard of review is to determine whether the court abused its discretion in finding that the actions or inactions of the party were in contempt of a court order. . . . In a civil contempt proceeding, the movant has the burden of establishing, by a preponderance of the evidence, the existence of a court order and noncompliance with that order." (Citations omitted; internal quotation marks omitted.) *Statewide Grievance Committee* v. *Zadora*, 62 Conn. App. 828, 831–32, 772 A.2d 681 (2001); see also *Oldani* v. *Oldani*, supra, 132 Conn. App. 626; *Gravius* v. *Klein*, 123 Conn. App. 743, 748–49, 3 A.3d 950 (2010). "[A] finding of indirect civil contempt must be established by sufficient proof that is premised upon competent evidence presented to the trial court in accordance with the rules of procedure as in ordinary cases." (Internal quotation marks omitted.) *Cologne* v. *Westfarms Associates*, 197 Conn. 141, 155, 496 A.2d 476 (1985).

Our cases clearly have held that a party attempting to establish an indirect civil contempt must do so by a preponderance of the evidence. We are bound by our prior decisions on this point. See, e.g., *Wilson* v. *Stamford*, 81 Conn. App. 339, 345 n.3, 840 A.2d 553 ("[t]he doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it" [internal quotation marks omitted]), cert. denied, 268 Conn. 918, 847 A.2d 312 (2004). We reject the defendant's invitation to distinguish these prior cases on the ground that they

addressed in dicta the question of the appropriate standard of proof. As there is no assertion on appeal that the court otherwise abused its discretion in finding that the defendant's actions were in contempt of the court's November 29, 2010 order, the defendant's claim must fail.

The judgments are affirmed.

In this opinion the other judges concurred.