# PETER OLDANI *v.* JACQUELINE OLDANI
## (AC 31652)

Gruendel, Robinson and Sullivan, Js.

Argued September 9—officially released December 20, 2011

*George J. Markley*, for the appellant-appellee (defendant).

*Edward Kanowitz*, for the appellee-appellant (plaintiff).

*Opinion*

ROBINSON, J. The defendant, Jacqueline Oldani, appeals from the judgment of the trial court dissolving her marriage to the plaintiff, Peter Oldani. The plaintiff cross appeals from the judgment of dissolution and from the court's subsequent decisions granting a motion for contempt filed by the defendant and denying the plaintiff's motion for modification of child support. On appeal, the defendant claims that the court erred (1) in determining that the parties' prenuptial agreement was enforceable and (2) by ordering the defendant to pay $25,000 in attorney's fees to the plaintiff. In his cross appeal, the plaintiff claims that the court erred (1) by failing to enforce all provisions of the prenuptial agreement, (2) by deviating from the child support guidelines in calculating the child support award, (3)

in calculating the amount of attorney's fees to be paid to the plaintiff by the defendant, (4) by finding the plaintiff in contempt for failing to pay his share of the mortgage, the taxes and the insurance on the parties' marital home as well as alimony payments in accordance with the dissolution judgment and (5) by denying the plaintiff's motion for modification of child support. We reverse the dissolution judgment as to the trial court's determination that the prenuptial agreement was enforceable and remand the matter for a new hearing as to all financial orders. We also affirm the court's decision granting the motion for contempt.

The record reveals the following undisputed facts and procedural history. The plaintiff commenced the underlying marital dissolution action by complaint dated May 2, 2008. The plaintiff alleged in the complaint that the parties' marriage had broken down irretrievably without any prospect for reconciliation, and he sought enforcement of the parties' prenuptial agreement. The defendant filed an answer, special defense and cross complaint for dissolution of marriage in which she challenged the enforceability of the prenuptial agreement. The matter was tried to the court over five days in June and July, 2009.

On August 10, 2009, the court issued a memorandum of decision dissolving the parties' marriage, in which it made the following factual findings. The parties met through a dating service in February or March, 2002. The plaintiff is approximately twenty years older than the defendant. The plaintiff had substantial assets in 2002, but the defendant had limited resources. They became engaged in June, 2002, and the defendant moved into the plaintiff's home in August, 2002. Shortly after their engagement, the parties began to discuss a prenuptial agreement. During negotiations, each party was represented by independent counsel of their own choosing. The parties were under no duress or stress

other than what ordinarily would be expected in planning a wedding. The parties signed a prenuptial agreement on December 2, 2002. The parties were married on December 6, 2002. They had a single child issue of the marriage, a daughter, born on June 25, 2004.[1] The parties executed a modification to the prenuptial agreement on January 7, 2006, to account for a second mortgage on the marital home.

In its memorandum of decision, the court concluded that the parties' prenuptial agreement was valid and enforceable. In accordance with the terms of the prenuptial agreement, the court ordered the plaintiff to pay the defendant alimony of $4166.67 per month for a period of eighty months or until the death, remarriage or cohabitation of the defendant. The plaintiff also was ordered to pay $350 per week in child support. The court explained that it had deviated from the child support guidelines "based upon other resources available to the plaintiff, coordination of total family support, best interest of the child and other equitable factors." The court ordered the parties to sell the jointly owned marital home, with the net proceeds from the sale to be divided equally between the parties. The court awarded exclusive possession of the home to the defendant until the property was sold. The parties were ordered to share equally in the payment of the first mortgage, taxes and insurance on the home until the closing of a sale, with the plaintiff solely responsible for payment of the second mortgage. Finally, the court ordered that the defendant was to be solely responsible for her own attorney's fees and that "[t]he defendant shall pay to the plaintiff $25,000 at the closing of the marital home for attorney fees incurred by the plaintiff pursuant to paragraph 8.9 of the prenuptial agreement."

---

[1] The parties filed a stipulated parenting plan awarding the defendant sole legal and physical custody of the child subject to visitation with the plaintiff. The parenting plan was approved by the court and incorporated into the judgment of dissolution.

Both parties filed motions to reargue portions of the court's dissolution orders, which were denied. The defendant's appeal from the dissolution judgment and the plaintiff's cross appeal followed. The defendant later filed a motion asking the court to terminate the appellate stay with respect to the order requiring the plaintiff to pay one half of the first mortgage, taxes and insurance and all of the second mortgage associated with the marital home. The court granted the motion to terminate the stay, finding that the due administration of justice required a lifting of the stay.[2] The defendant later filed a motion for contempt, claiming that, despite the lifting of the appellate stay, the plaintiff was not making the required payments regarding the marital home, and he was also making unauthorized reductions in his alimony and child support payments to offset money he claimed he was owed by the defendant. The plaintiff filed a motion to modify the amount of the child support payments, arguing that his income and other resources available to him had been reduced substantially.

The court held an evidentiary hearing on the motion for contempt and the motion to modify on October 27, 2010. The court heard final arguments on October 28, 2010, following which it issued an oral decision finding the plaintiff in contempt based on his offsetting of alimony payments and his failure to pay his one half of the first and all of the second mortgage.[3] The court

[2] Specifically, the court concluded that the stay had to be lifted to avoid a foreclosure of the marital home. The court found that the defendant could not service the debt on the property alone and that the plaintiff's financial affidavit showed that he had the financial ability to comply with the court's order without suffering irreparable harm. The plaintiff filed a motion for review of the termination of stay. This court granted the motion for review but denied the relief sought therein.

[3] In its oral ruling, the court also specifically declined to find the plaintiff in contempt with regard to his failure to comply with the court's child support order because the court found that the plaintiff legitimately was mistaken about how certain social security retirement benefits of the plaintiff that the Social Security Administration recently had begun to pay to the

ordered the plaintiff to pay the defendant $12,463.50 on or before November 30, 2010. The court also effectively denied the plaintiff's motion to modify child support, finding that the plaintiff had failed to meet his burden of showing a substantial change in circumstances. The plaintiff amended his cross appeal to include challenges to the court's October 28, 2010 rulings.[4] Additional facts will be set forth as necessary.

## I

The defendant first claims that the court erred in determining that the parties' prenuptial agreement was enforceable because (1) the plaintiff had failed to make a fair and reasonable disclosure of his income and (2) the agreement was unconscionable at the time the plaintiff sought to enforce it. Before turning to the defendant's claim, we first set forth the legal standard governing our review.

Prenuptial agreements entered into on or after October 1, 1995, are governed by the Connecticut Premarital Agreement Act (act), General Statutes §§ 46b-36a through 46b-36j.[5] See *Friezo* v. *Friezo*, 281 Conn. 166,

defendant on behalf of the minor child affected his child support obligation. The court later prepared a written order memorializing the terms of its oral decision. The written order states that the court found the plaintiff in contempt for failing to make the required mortgage payments and "for offsetting child support payment." In light of the court's more detailed oral ruling, we conclude that the written order contains a scrivener's error to the extent that it uses the term child support instead of alimony.

[4] The plaintiff filed an earlier amended cross appeal from the court's denial of his motion that sought reinstatement of the court's pendente lite orders requiring the defendant to pay for costs and expenses associated with the marital home during the pendency of the appeal. In denying the request, the court noted that "it would be inequitable to only reinstate a portion of the pendente lite orders without considering alimony and child support and the parties' ability to pay." Because the plaintiff has not addressed that ruling in his appellate brief, any claims of error are deemed abandoned. See *McKeon* v. *Lennon*, 131 Conn. App. 585, 595 n.2, 27 A.3d 436, cert. denied, 303 Conn. 901, 31 A.3d 1178 (2011).

[5] The enforceability of prenuptial agreements executed prior to October 1, 1995, is governed by common-law principles and "the seminal, three-

182, 914 A.2d 533 (2007). The prenuptial agreement in the present case was signed by the parties on December 2, 2002. Accordingly, the act is applicable in assessing whether the agreement is enforceable. The statutory scheme provides in relevant part that "[a] premarital agreement or amendment shall not be enforceable if the party against whom enforcement is sought proves that: (1) Such party did not execute the agreement voluntarily; or (2) The agreement was unconscionable when it was executed or when enforcement is sought; or (3) Before execution of the agreement, such party was not provided a fair and reasonable disclosure of the amount, character and value of property, financial obligations and income of the other party; or (4) Such party was not afforded a reasonable opportunity to consult with independent counsel."[6] General Statutes § 46b-36g (a). Our Supreme Court has held that a court's determination whether a prenuptial agreement is unenforceable pursuant to § 46b-36g presents a mixed question of fact and law over which our review is plenary. See *Friezo* v. *Friezo*, supra, 180. In reviewing the court's decision, we must therefore determine whether the court's conclusions are legally and logically correct and supported by the facts in the record. Id., 181.

The defendant first argues that the court erred in concluding that the prenuptial agreement was enforceable because, before execution of the agreement, the plaintiff failed to provide her with a fair and reasonable disclosure of his income. In particular, the defendant contends that (1) the financial statement provided by the plaintiff prior to the execution of the prenuptial

prong test" set forth in *McHugh* v. *McHugh*, 181 Conn. 482, 485–86, 436 A.2d 8 (1980). *Crews* v. *Crews*, 295 Conn. 153, 159–60, 989 A.2d 1060 (2010).

[6] The legislature's use of the disjunctive in § 46b-36g (a) means that a party only needs to prove one of the enumerated bases listed in the statute in order to demonstrate that a prenuptial agreement is unenforceable. See *Leonard* v. *Commissioner of Revenue Services*, 264 Conn. 286, 299–300, 823 A.2d 1184 (2003).

agreement was an insufficient disclosure as to the plaintiff's income, (2) the court should have considered the defendant's ability to understand the plaintiff's financial disclosure in deciding whether the disclosure was fair and reasonable and (3) the plaintiff's financial disclosure contained other errors and omissions. Because we agree with the defendant that the plaintiff failed to provide the defendant with a fair and reasonable disclosure of his income prior to her signing the agreement, we need not address the remainder of the defendant's arguments concerning the enforceability of the prenuptial agreement.

In *Friezo* v. *Friezo*, supra, 281 Conn. 181–93, our Supreme Court first construed the meaning of "fair and reasonable disclosure" as that term is used in § 46b-36g. The court first noted that the term is not defined in the statute, but "a plain reading of the statute indicates that the term was intended to be understood in the context of the phrase that directly follows, namely, 'the amount, character and value of property, financial obligations and income of the other party . . . .' Accordingly, 'fair and reasonable' disclosure refers to the nature, extent and accuracy of the information to be disclosed, and not to extraneous factors such as the timing of the disclosure." (Citation omitted.) Id., 182–83.

The court next looked at the legislative history of the act. It noted that the bill as originally conceived had required a party who sought to invalidate a prenuptial agreement to prove "not only that he or she was not provided a 'fair and reasonable disclosure of the amount, character and value of property, financial obligations and income of the other party,' but that he or she '[d]id not voluntarily and expressly waive, in writing, any right to disclosure of the property, financial obligations and income of the other party beyond the disclosure provided' and '[d]id not have, or reasonably

could not have had, an adequate knowledge of the property, financial obligations and income of the other party, and of the legal rights which that party would relinquish under the agreement . . . .' Substitute House Bill No. 6932, § 6 (1995 Sess.). An amendment, however, eliminated the second and third requirements. See Substitute House Bill No. 6932, § 6 (1995 Sess.), as amended by House Amendment Schedule A." *Friezo* v. *Friezo*, supra, 281 Conn. 185. The *Friezo* court reasoned that the elimination of the additional requirements was intended to make it easier for a party to prove lack of a "fair and reasonable" financial disclosure and "demonstrated the legislature's intent that the disclosure requirement *focus on the information to be disclosed rather than on the party to whom disclosure is made.*" (Emphasis added.) Id. The court concluded that the legislative history nevertheless was unhelpful in determining what constitutes a fair and reasonable disclosure. Id.

Finally, the court turned to a discussion of case law from this jurisdiction and others. The court first considered *McHugh* v. *McHugh*, 181 Conn. 482, 436 A.2d 8 (1980), the seminal Connecticut case addressing the adequacy of financial disclosures in prenuptial agreements under common-law standards. In *McHugh*, the court had "articulated the principle that, because the parties to a prenuptial agreement stand in a relationship of directly mutual confidence, [t]he duty of each party to disclose the amount, character, and value of individually owned property, absent the other's independent knowledge of the same, is an essential prerequisite to a valid antenuptial agreement containing a waiver of property rights. . . . The burden is not on either party to inquire, but on each to inform, for it is only by requiring full disclosure of the amount, character, and value of the parties' respective assets that courts can ensure intelligent waiver of the statutory

rights involved." (Internal quotation marks omitted.) *Friezo* v. *Friezo*, supra, 281 Conn. 186.

Although the court in *McHugh* was not discussing the meaning of a fair and reasonable disclosure as that term is used in § 46b-36g, the *Friezo* court recognized that "the decision is helpful in interpreting the statute because the financial disclosure requirements described in *McHugh* and the statute are, for all practical purposes, the same. Moreover . . . the proposed statute was intended to clarify *McHugh*, not to supplant the legal principles espoused therein." Id., 185–86 n.23, citing Conn. Joint Standing Committee Hearings, Judiciary, Pt. 7, 1995 Sess., p. 2492; *Dornemann* v. *Dornemann*, 48 Conn. Sup. 502, 511, 850 A.2d 273 (2004) ("[t]he [act] endorses, clarifies and codifies the *McHugh* standards"). According to the *Friezo* court, the court in *McHugh* made three significant points: "First, the purpose of disclosure is to ensure that each party has sufficient knowledge of the other party's financial circumstances to understand the nature of the legal rights being waived. . . . In other words, a party cannot know what is being waived unless he or she is privy to all of the relevant facts, in particular, the financial status of the other party. . . . Second, financial disclosure in Connecticut must be understood as a burden to inform borne solely by the disclosing party. . . . Accordingly, the court's examination of whether proper disclosure has been made must focus on the actions of the disclosing party rather than on the party to whom disclosure is made. . . . Third, 'full' financial disclosure is required in a prenuptial agreement only if the party to whom disclosure is made does not have independent knowledge of the other party's financial circumstances." (Citations omitted.) *Friezo* v. *Friezo*, supra, 281 Conn. 186–87.

After discussing cases from other jurisdictions with similar statutory provisions, the Supreme Court concluded that financial disclosures by parties to a prenuptial agreement are not required "to be exact or precise"; id., 189; rather, in accord with many other jurisdictions, "a fair and reasonable financial disclosure requires each contracting party to provide the other with a general approximation of their income, assets and liabilities, and . . . a written schedule appended to the agreement itself, although not absolutely necessary, is the most effective method of satisfying the statutory obligation in most circumstances." Id., 191. Because in *Friezo*, the defendant's written financial disclosure attached to the prenuptial agreement contained "an accurate representation, in writing, of his income and financial assets at the time the agreement was executed," the Supreme Court ultimately determined that the prenuptial agreement in that case was enforceable. Id., 192.

In the present case, the parties also exchanged written financial disclosures that were appended to the prenuptial agreement. The plaintiff's financial statement consists of a three page document purporting to provide information regarding the plaintiff's finances as of May 1, 2002.[7] The first page contains a list of the plaintiff's assets and liabilities itemized by category and, in some instances, referencing certain schedules. The plaintiff's total assets were listed as $8,416,104.30, with the largest category of assets being his real estate investments, which were valued at $7,856,736.30. The plaintiff's total liabilities were listed as $3,056,023.69, leaving the plaintiff with a stated net worth at the time of $5,360,060.61. The next two pages consist of the schedules referenced on the first page of the disclosure. The

---

[7] In its memorandum of decision, the court noted that "[a]lthough the financial statement was dated May, 2002, the plaintiff testified that the information was reliable as of December, 2002. The court finds this testimony credible."

first schedule contains some additional details about the plaintiff's bank accounts, notes and loans receivable, life insurance policies and securities. The second schedule, titled "real estate schedule," is a spreadsheet listing the plaintiff's interests in eleven commercial real estate properties, two residential lots, a rental home, a condominium and a private residence. In addition to the location and general description of each property, the real estate schedule includes, for each property, the plaintiff's percentage of ownership, the overall replacement value for the property, the total mortgage debt and corresponding annual payments, the plaintiff's portion of the mortgage debt obligation and the plaintiff's overall net equity in the property. The schedule also includes the annual gross rent received for each property where applicable, the annual operating expenses of those properties, and a column with the heading "N.O.I." That heading is not defined on the disclosure itself; however, at trial, the plaintiff testified that it stands for "net operating income."

In its memorandum of decision addressing the defendant's allegation that the plaintiff's financial statement was not a fair and reasonable disclosure of the plaintiff's income, the court expressly found that "[t]he plaintiff's financial statement does not specifically indicate his income." The court nevertheless went on to consider whether, despite the lack of an express disclosure of income, the financial statement provided by the plaintiff contained sufficient information from which to determine the plaintiff's income. The court stated: "The plaintiff prepared a spreadsheet (Exhibit A), which extrapolated the information provided in the financial statement to show net income of $179,642." Ultimately, the court concluded that "the plaintiff's disclosure was more than adequate to ensure that the defendant would be able to make an intelligent waiver of her statutory rights."

Nowhere on the real estate schedule does the plaintiff expressly identify the amount of net income that he had received or was entitled to receive as a result of his various real estate investments. The schedule does not provide any formula or directions for calculating the plaintiff's share of the rental income. The schedule does not contain a statement or figure that represents the plaintiff's income at the time. In fact, the word "income" does not appear on any of the pages of the plaintiff's financial disclosure. The plaintiff argued at trial that all the necessary figures for approximating his rental income, nevertheless, were included on his financial statement and that the defendant simply had to do the mathematical calculation. The plaintiff testified that his share of rental income as to each property could be calculated from the numbers provided by subtracting from the annual gross rents both the annual mortgage payments and the annual operating expense and then multiplying the result by his percentage of ownership. On cross-examination, however, the plaintiff conceded that there often was a holdback of a portion of the rental income; thus, even if one did the calculations he described, this would not accurately reflect his rental income. The defendant was represented by counsel prior to execution of the prenuptial agreement, and no credible evidence was presented that the defendant or her counsel questioned the sufficiency of the plaintiff's disclosure prior to signing the prenuptial agreement;[8] however, as our Supreme Court has stated, the law places no duty or burden on either party to inquire as to the requisite disclosure of the other party, only a duty on each to inform. See *Friezo* v. *Friezo*, supra, 281 Conn. 186.

---

[8] Attorney David Erdos, who represented the defendant during the negotiation and execution of the prenuptial agreement, testified at trial that he believed that the plaintiff's financial disclosure was insufficient as to the plaintiff's income at the time the prenuptial agreement was executed but nonetheless allowed his client to sign the agreement. In its decision, the trial court expressly found that attorney Erdos' testimony was not credible.

The court concluded that the defendant should have been able to approximate the plaintiff's income from the information she was provided. The court supported that conclusion, however, by referencing an exhibit prepared by the plaintiff for the dissolution trial for the purpose of aiding the court in understanding the plaintiff's original financial disclosure with respect to income. Unlike the financial statement disclosed to the defendant, the exhibit contains a column specifically noting net income.[9] There is nothing in the record to suggest that the exhibit relied on by the trial court, or any equivalent tool, was ever provided to the defendant or to the defendant's counsel prior to the signing of the prenuptial agreement. In other words, in evaluating the "nature, extent and accuracy" of the plaintiff's disclosure regarding income, the court relied on information and calculations that were not part of the disclosure provided to the defendant prior to her signing the prenuptial agreement.

In addition to the passive income derived from his real estate investments, the plaintiff testified that he occasionally took in other income in the form of consulting fees for supervising construction projects and, less frequently, distributions attributable to mortgage refinances or the sale of properties in which he held an interest. He also testified to collecting both interest and dividend income. No information with respect to any of those additional sources of income was provided on the plaintiff's financial statement. In its decision, the court credited the plaintiff's testimony that he was not receiving income from consulting fees at the time of the marriage, but then found "the failure to list any such income as irrelevant to the validity of the disclosure." Any failure on the part of the plaintiff to disclose

---

[9] The plaintiff testified about several inaccuracies with the figures on the exhibit. Thus, it is not even clear that the exhibit is an accurate representation of the plaintiff's net income at the time the prenuptial agreement was executed.

a portion of his income would be relevant to the task of considering the accuracy of his disclosure. The court similarly accepted the plaintiff's argument that he had not received any distributions attributable to refinances or sales of properties in 2002 or 2003, "and that he had no control over when or whether there would be a distribution." Ultimately, the court stated that it found any failure "to list these distributions did not render the disclosure to be unfair or unreasonable."

In considering how the plaintiff's alleged failure to disclose his nonrental sources of income should affect the court's determination whether the plaintiff had made a fair and reasonable disclosure of his income, the court also noted the defendant's testimony that "she knew that [the plaintiff] had substantial assets" and that "she did not care about the agreement, and that she signed the agreement because she wanted the plaintiff to know that she did not want his money." That particular testimony, however, does not pertain to "the nature, extent and accuracy of the information to be disclosed . . . ." *Friezo* v. *Friezo*, supra, 281 Conn. 183. The court made no finding that the defendant had independent knowledge of the plaintiff's income or earning capacity, only that the defendant generally knew that the plaintiff had "substantial assets." See *Winchester* v. *McCue*, 91 Conn. App. 721, 727–28, 882 A.2d 143 (2005) (holding under common-law standard that parties' failure to disclose income not fatal to prenuptial agreement if parties had independent knowledge of each other's income). In considering the defendant's reason for signing the prenuptial agreement, the court appears to have been considering extraneous factors unrelated to whether the financial information provided by the plaintiff was fair and reasonable.

We are cognizant of the general proposition that "[c]ontracting parties are normally bound by their

agreements . . . irrespective of whether the agreements embodied reasonable or good bargains . . . ." (Citation omitted; internal quotation marks omitted.) *Friezo* v. *Friezo*, supra, 281 Conn. 199, quoting *Simeone* v. *Simeone*, 525 Pa. 392, 400, 581 A.2d 162 (1990). Section 46b-36g (a) (3) nevertheless provides that a prenuptial agreement is unenforceable unless, prior to execution of the agreement, each party gives a fair and reasonable disclosure of "the amount, character and value of property, financial obligations *and income* . . . ." (Emphasis added.) Our Supreme Court has determined that, to be "fair and reasonable," a party's disclosure does not need to be exact but must at least provide a general approximation. Focusing on the information disclosed by the plaintiff, our plenary review of the record reveals that, although the plaintiff may have provided a sufficient approximation of his property holdings and other financial obligations, he failed to provide the defendant with sufficient information regarding his income prior to her signing the prenuptial agreement. Because the plaintiff failed to meet this burden to inform, it was not legally and logically correct for the court to have determined that the prenuptial agreement was enforceable. Accordingly, we reverse that portion of the court's dissolution judgment.

Our decision regarding the enforceability of the prenuptial agreement places in question the propriety of the financial orders, which were rendered in accordance with the prenuptial agreement. We must, therefore, remand the matter to the trial court with direction to hold a new hearing as to all financial orders, including attorney's fees.[10] We need not address the remainder

---

[10] "Normally, when a portion of the court's financial order is found to be flawed, we return the matter to the trial court for a new hearing on the ground that in marital dissolution jurisprudence, financial orders often are interwoven." *Rosato* v. *Rosato*, 77 Conn. App. 9, 20, 822 A.2d 974 (2003). "[O]ur courts have utilized the mosaic doctrine as a remedial device that allows reviewing courts to remand cases for reconsideration of all financial orders . . . ." *Casey* v. *Casey*, 82 Conn. App. 378, 389 n.9, 844 A.2d 250 (2004).

of the defendant's arguments concerning the enforceability of the prenuptial agreement or her additional claim on appeal challenging the propriety of the attorney's fee award, which also must be reconsidered on remand.

## II

Turning to the plaintiff's cross appeal, the plaintiff claims that the trial court improperly (1) failed to enforce all of the provisions of the party's prenuptial agreement, (2) deviated from the child support guidelines in calculating the child support order, (3) calculated the award of attorney's fees to the plaintiff, (4) found the plaintiff in contempt and (5) denied the plaintiff's motion for modification of the child support order. Our conclusion in part I of this opinion regarding the enforceability of the parties' prenuptial agreement and our remand order will require a new trial as to all financial orders, including revisiting the child support orders and the award of attorney's fees. Accordingly, we need address only the plaintiff's claim that the court erred in granting the defendant's postdissolution motion for contempt.[11]

"The abuse of discretion standard applies to a trial court's decision on a motion for contempt. . . . A finding of contempt is a question of fact, and our standard of review is to determine whether the court abused its discretion in [finding] that the actions or inactions of the [party] were in contempt of a court order. . . . To

[11] To be clear, it is unnecessary for us to review the first three claims, all of which challenge aspects of the financial orders rendered in conjunction with the dissolution judgment, based on our partial reversal of that judgment and our remand to the trial court for new financial orders. As to the final claim, any argument that the court improperly denied the plaintiff's motion for modification of the child support order has similarly been rendered moot by our remand order, and there is no need for us to further address the claim. See *Watrous* v. *Watrous*, 108 Conn. App. 813, 815 n.2, 949 A.2d 557 (2008).

constitute contempt, a party's conduct must be wilful.
. . . Noncompliance alone will not support a judgment
of contempt. . . . We review the court's factual find-
ings in the context of a motion for contempt to deter-
mine whether they are clearly erroneous. . . . A
factual finding is clearly erroneous when it is not sup-
ported by any evidence in the record or when there is
evidence to support it, but the reviewing court is left
with the definite and firm conviction that a mistake has
been made. . . . The resolution of conflicting factual
claims falls within the province of the trial court. . . .
The trial court's findings are binding upon this court
unless they are clearly erroneous in light of the evidence
and the pleadings in the record as a whole. . . . We
cannot retry the facts or pass on the credibility of the
witnesses. . . . A reviewing authority may not substi-
tute its findings for those of the trier of the facts. . . .
In a civil contempt proceeding, the movant has the
burden of establishing, by a preponderance of the evi-
dence, the existence of a court order and noncompli-
ance with that order." (Citations omitted; internal
quotation marks omitted.) *Gravius* v. *Klein*, 123 Conn.
App. 743, 748–49, 3 A.3d 950 (2010).

In the present case, the court found the plaintiff in
contempt for violating the court's orders requiring the
plaintiff to pay $4166.67 in monthly alimony to the
defendant and to pay one half of the taxes, insurance
and first mortgage payment on the marital home and
all of the second mortgage payment. The plaintiff claims
that the court abused its discretion because the evi-
dence did not support findings that he wilfully disre-
garded the court's orders. We disagree.

The court issued an oral ruling on the motion for
contempt on October 28, 2010. With respect to the ali-
mony payments, the court found that the plaintiff, on
several occasions, failed to make full payments because
he deducted moneys that he believed were owed to

him by the defendant. The court recognized that the defendant had conceded the fact that she owed money to the plaintiff. The court nevertheless found the defendant's testimony credible that there was never any agreement between the parties that the plaintiff would obtain repayment by deducting money from the alimony payments. The court found that the plaintiff's testimony to the contrary was not credible. We will not revisit the court's credibility findings because such determinations are wholly within the province of the court as the trier of fact. See *Somers* v. *Chan*, 110 Conn. App. 511, 530, 955 A.2d 667 (2008). The court wanted to ensure that the plaintiff understood that such "self-help" was not permissible and stated that the plaintiff was "charged with understanding that from the existing orders." In other words, the plaintiff should have known that he was not permitted to alter the amount he paid in alimony without a subsequent order of the court, but he nevertheless did so. In light of the evidence and the record as a whole, the court's findings are not clearly erroneous, and the trial court did not abuse its discretion in finding the plaintiff in contempt.

As to the property taxes, insurance and mortgage payments, the plaintiff conceded that, after the court terminated the appellate stay, he failed to make all required payments in accordance with the dissolution judgment but argued that he was unable to pay based on a change in his financial circumstances. "The burden to prove financial incapacity in such instances rests with the contemnor. . . . Whether the defendant established his inability to pay the order by credible evidence is a question of fact . . . subject to the clearly erroneous standard of review." (Internal quotation marks omitted.) *Creatura* v. *Creatura*, 122 Conn. App. 47, 59, 998 A.2d 798 (2010). Here, the court determined

that the plaintiff had failed to show any real change in his financial situation. The court found that the plaintiff's testimony regarding his finances was not credible. The court later stated: "I would have expected [the plaintiff] to bring some scintilla of evidence corroborating his claim that his chief source of income was markedly reduced over the last—from where it was ten months ago. Instead, he basically indicated he didn't really have much specific knowledge, he didn't know the information. You know, he brought nothing. He brought no—no partner, no—no profit and loss statements, absolutely nothing to show the—the claim of his that one of his businesses has decreased so dramatically over the last few months. In general, his testimony was not very credible, and I didn't find very credible his verbal representation to the court regarding that loss of income." The court also stated that it was particularly struck by the fact that, despite the plaintiff's having received a distribution of $25,000 in April, the plaintiff did not use any of that money toward payment of his obligations on the mortgage. On the basis of our review of the record, we cannot say that the court's findings regarding the plaintiff's ability to pay are clearly erroneous, especially where the plaintiff relied almost entirely on his own testimony, which the court found was not credible. We conclude that the court did not abuse its discretion in finding the plaintiff in contempt and we affirm the court's decision granting the defendant's motion for contempt.

The judgment is reversed only as to the finding that the parties' prenuptial agreement is enforceable and the case is remanded for a new hearing as to all financial orders. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.