******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

WILLIAM MARSHALL, JR. *v.* KIMBERLY MARSHALL
(AC 34674)

Beach, Sheldon and Norcott, Js.

*Argued January 14—officially released July 22, 2014*

(Appeal from Superior Court, judicial district of
Fairfield, Alander, J. [dissolution judgment]; Klatt, J.
[motions to modify, for contempt].)

*George J. Markley*, for the appellant (defendant).

*Karen L. Dowd*, with whom were *Brendon P. Levesque* and, on the brief, *Melissa J. Needle*, for the appellee (plaintiff).

*Opinion*

BEACH, J. The defendant, Kimberly Marshall, appeals from the rulings of the trial court in favor of the plaintiff, William Marshall, Jr., on various postjudgment motions. The defendant claims that the court erred in (1) calculating the amount of alimony owed by the plaintiff under the parties' separation agreement, (2) denying her motion for contempt, (3) failing to award statutory interest and (4) granting the plaintiff's motion to modify alimony. We reverse, in part, the judgment of the trial court.

The following undisputed facts and procedural history are relevant. The parties were married in 1981. Four children were born of the marriage; only one was a minor at the time of dissolution. In 2006, the plaintiff filed a complaint seeking dissolution of his marriage to the defendant. In May, 2007, the court rendered judgment of dissolution and incorporated by reference a separation agreement between the parties, which the court found to be fair and equitable.

In August, 2011, the plaintiff filed a postjudgment motion to modify alimony on the ground that the agreement provided that either party had the right to move for modification of alimony on the basis of a substantial change in circumstances and that there had been such a change. In September, 2011, the defendant filed a postjudgment motion for contempt on the ground that the plaintiff had failed to pay unallocated alimony and child support as provided in the agreement. In that motion, the defendant also sought counsel fees and statutory interest. In March, 2012, after a hearing on the motions, the court denied the defendant's motion for contempt, declined to award the defendant attorney's fees or statutory interest, and granted the plaintiff's motion to modify. This appeal followed.

I

The defendant claims that the court erred in calculating the amount of alimony owed by the plaintiff under the agreement. We agree and remand the case to the trial court for further proceedings on this issue.

In domestic relations cases, "[a] judgment rendered in accordance with . . . a stipulation of the parties is to be regarded and construed as a contract. . . . Accordingly, [o]ur resolution of the [plaintiff's] claim is guided by the general principles governing the construction of contracts. A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural and ordinary meaning and usage where it can be sensibly

applied to the subject matter of the contract. . . .

"Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . [T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . [I]n construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous. . . . If a contract is unambiguous within its four corners, intent of the parties is a question of law requiring plenary review. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact, and the trial court's interpretation is subject to reversal on appeal only if it is clearly erroneous. . . . To identify and to apply the appropriate standard of review, we must, therefore, initially determine whether the agreement . . . was unambiguous." (Citation omitted; internal quotation marks omitted.) *McKeon* v. *Lennon*, 147 Conn. App. 366, 272–73, 83 A.3d 639 (2013).

Article 4 of the agreement is entitled "alimony and child support." Paragraph 4.1 provides: "For purposes of this Article Four, 'pre-tax income from employment' shall only include salary and cash bonus received by the [plaintiff] in cash (or check) from employment before any deductions, including, but not necessarily limited to federal, state or municipal income taxes, social security, Medicare, insurance of any kind, or payments by the [plaintiff] to any defined contribution plan, e.g. a 401 (k) plan. The foregoing to the contrary notwithstanding, specifically excluded from this definition of 'pre-tax income from employment' shall be . . . (v) Subchapter S distributions received by the [plaintiff] by virtue of his forty (40%) percent interest in Artisans Home Builders, Inc. or other like distributions from any company in which the [plaintiff] acquires an ownership interest . . . ."

Paragraph 4.2 of the agreement provides that, commencing June 1, 2007, and until the death of either party, the defendant's remarriage or cohabitation, or sixty months, whichever shall first occur, "the [plaintiff] shall pay unallocated alimony and child support in cash to the [defendant] as follows: an amount equal to forty (40%) percent of the [plaintiff's] pre-tax income from employment, which income the parties stipulate to be $192,000 per year." The parties stipulated in paragraph 4.2 that the plaintiff's "pre-tax income from employment" equaled $192,000 per year. Paragraph 4.2 of the

agreement also explains the derivation of the $192,000 figure: "The $192,000 pretax income from employment is based upon the accepted opinion of a joint appraisal conducted by Meyers, Harrison & Pia as to the fair market value of the [plaintiff's] 40% interest in Artisans, Maker of Fine Homes, Inc. (Artisans).[1] Said appraisal concluded that reasonable and appropriate compensation levels of the [plaintiff] for the year ended in December 1, 2005 is $175,000. In addition to the $175,000, the parties agree to include, as 'pre-tax income' monies paid directly by Artisans for the benefit of the [plaintiff]. Currently, this direct payment benefit consists of the payment of medical insurance premium in the approximate annual amount of $17,000. Accordingly, for purposes of modification, the parties have ascribed a base salary of $175,000 plus additional direct benefits of $17,000 for a total pretax income of $192,000. Specifically excluded from this pretax income and not to be considered in a modification hearing is the return on investment the [plaintiff] receives as an equity holder in the business. By way of example, in 2005, the [plaintiff's] income from wages and salaries (W-2) and S Corporation income (K-1) was $681,982. Notwithstanding, because the earnings of Artisans (i.e. in sums in excess of $192,000) were used to value Artisans as an asset, monies the [plaintiff] receives in excess of $192,000 shall not be considered a 'pretax income from employment.' " (Footnote added.)

Paragraph 4.4 provides: "If the [plaintiff's] base salary and direct benefits from Artisans Home Builders, Inc., or a subsequent employer, exceeds or is less than $192,000 . . . [the plaintiff shall notify the defendant]. The change in the [defendant's] entitlement of the forty (40%) percent . . . whether more or less, shall be effective on the first day of the month following the [plaintiff's] receipt of a salary increase or of a salary decrease."[2]

In its March, 2012 decision, the court found that the plaintiff paid alimony in accordance with the agreement in 2007 and 2008, that he reduced alimony payments to $3200 for the first six months of 2009, and that he stopped all alimony payments as of July 1, 2009. The court noted that the plaintiff testified that he was an owner of Artisans, a company that built custom homes, and that by 2009, Artisans had suffered a significant decline in business. The court found that the plaintiff's income was $192,000 in 2007, that it had been reduced to $72,000 by 2009, and remained at approximately $72,000 for 2010 and 2011.

The court determined that paragraph 4.4 of the agreement was self-executing and provided a straightforward formula for calculating unallocated alimony and child support obligation that was based on certain increases or decreases in income. The court concluded that the agreement did not provide for the complete

cessation of alimony payments in the event of a change in income; rather, the plaintiff should have reduced his alimony payments, in accordance with paragraph 4.4, to 40 percent of his W-2 income. The court found that the plaintiff's yearly W-2 salary in 2009 was $72,000 and concluded that he owed $2400 per month for that year. The court found that the plaintiff owed alimony in the following amounts: $14,400 for the year 2009 (six months @ $2400/month); $28,800 for the year 2010 (twelve months @ $2400/month); $19,200 for the year 2011 (eight months @ $2400/month); for a total of $62,400 to be paid in monthly installments of $2400 until paid in full. The court modified the plaintiff's alimony payments pursuant to paragraph 4.6 of the agreement to $1 per year retroactive to August 31, 2011.

II

The defendant argues that the court erred in its determination of what constituted income under paragraph 4.2. She contends that the court calculated the amount of alimony due by taking 40 percent of the plaintiff's W-2 income only and "completely ignored the other two components of the plaintiff's income, those being his distributions and his direct benefits of $17,000 per year." We consider each argument in turn.

A

First, the defendant argues that the court erred in failing to include in its calculation of arrearage the $17,000 per year the plaintiff received as "direct benefits." We agree.

Pursuant to paragraph 4.2, the amount of unallocated alimony and child support owed by the plaintiff equaled 40 percent of his "pre-tax income from employment . . . ." That paragraph stated that "pre-tax income from employment" equaled "base salary" plus "direct benefits . . . ." Paragraph 4.2 stated: "In addition to [base salary], the parties agree to include, as 'pre-tax income' monies paid directly by Artisans for the benefit of [the plaintiff]. Currently, this direct payment benefit consists of the payment of medical insurance premium in the approximate annual amount of $17,000." According to the unambiguous language of paragraph 4.2, then, direct benefits were specifically to be included in the calculation of unallocated alimony and child support. Neither party disputes that the amount of "direct benefits" for 2009, 2010 and 2011 that the plaintiff received from Artisans remained at $17,000.[3] The court found that the plaintiff reduced total alimony and support payments to $3200 for the first six months of 2009, and that he stopped all alimony payments as of July 1, 2009. Because the agreement unambiguously provided for alimony and child support derived from "direct benefits," which amounted to $17,000 per year, those amounts should have been included in the calculation of the arrearage. On remand, the court is directed to

calculate the arrearage accordingly.

## B

Second, the defendant argues that the court erred in failing properly to determine the amount of the plaintiff's "pre-tax income from employment," aside from his direct benefits, in its calculation of unallocated alimony and child support. The defendant contends that the exclusion, in paragraph 4.1, of the plaintiff's "[s]ubchapter S distributions" from Artisans from the definition of "pre-tax income from employment" should not be read in isolation, but rather must be read in conjunction with other provisions, notably paragraph 4.2, which calculates the amount of alimony and support on the basis of a stipulated pretax income of $192,000. The $192,000 figure included $17,000 in direct benefits and $175,000 in "base salary." The defendant argues that the term "base salary" included income designated as W-2 income and also, potentially, amounts that may have been labeled as distributions.[4] The defendant points out that when the parties entered into the agreement, the plaintiff's financial affidavit showed that he had a base W-2 salary of $130,000, yet the parties stipulated that his base salary was $175,000, in order to account for the fair value of compensation for the plaintiff's services, as determined by accountants. The defendant argues that "the $192,000 figure was to be used regardless of how the plaintiff and his company chose to allocate his compensation between W-2 income and K-1 distributions. It was specifically because the plaintiff's base W-2 income was understated, and because he had shifted so much of his compensation into distributions, that the language of paragraph 4.2 was arrived at. That language made clear that a reasonable base compensation for the plaintiff was $175,000, and if he chose to shift income into distributions as opposed to his W-2 income, such fact would not permit him to avoid his alimony obligations . . . ." The defendant argues that if the alimony and child support were to be based on 40 percent of the plaintiff's base income as defined by W-2's, then the day after the entry of the dissolution judgment ordering the plaintiff to pay 40 percent of $192,000 in alimony, the plaintiff would have been able successfully to modify the alimony payments to 40 percent of $130,000, which was his W-2 income at the time of dissolution. The defendant further argues that the plaintiff's conduct in paying 40 percent of $192,000 throughout 2007 demonstrated the parties' intent to require the plaintiff to pay 40 percent of his combined base income, distributions and direct benefits, up to a maximum of $192,000 (unless, presumably, his W-2 compensation exceeded $175,000).

Under paragraph 4.2, unallocated alimony and child support during the years in question was to amount to 40 percent of the plaintiff's "pre-tax income from employment . . . ." Paragraph 4.2 of the agreement

provided that the amount of the plaintiff's "pre-tax income from employment" was to be determined by adding a stipulated "base salary" of $175,000 to the plaintiff's "additional direct benefits" of $17,000, for a total stipulated "pre-tax income from employment" of $192,000. Specifically, the base salary was based on the accepted opinion of a joint appraisal as to the "fair market value of the [plaintiff's] 40 [percent] interest in . . . Artisans," and the "reasonable and appropriate compensation" of the plaintiff by Artisans.

The agreement is ambiguous as to whether the plaintiff's distributions from Artisans, or K-1 income, were to be included in "pre-tax income from employment" and, if so, to what extent. Paragraph 4.1 specifically excludes "[s]ubchapter S distributions" from the definition of "pre-tax income from employment." Paragraph 4.2, however, does not limit "pre-tax income from employment" to W-2 income only. That paragraph defines "pre-tax income from employment" as "base salary" plus additional benefits. In paragraph 4.2, the parties used the fair market value of the plaintiff's 40 percent interest in Artisans to arrive at "reasonable and appropriate compensation levels" for the plaintiff's "base salary" for the 2005 tax year. The plaintiff's 2007 amended federal 1040 form indicated that his W-2 income was $126,144, which amount is less than the stipulated amount in paragraph 4.2 of $175,000 for the plaintiff's base salary.[5] Paragraph 4.4 provides for a modification if the plaintiff's "base salary and direct benefits" should be greater or less than $192,000. In order to reconcile paragraphs 4.1 and 4.2, and to determine the extent to which K-1 income is to be included in the calculation of "base salary," the trial court must engage in fact-finding as to the intent of the parties. See, e.g., *Page* v. *Page*, 77 Conn. App. 748, 749, 825 A.2d 187 (2003) (where contract language ambiguous, intent of parties is question of fact to be determined on remand). Because the agreement is ambiguous, we remand the case to the trial court in order to determine the intent of the parties and to determine the arrearage accordingly.

## III

### A

The defendant next claims that the court erred in failing to find the plaintiff in contempt. The trial court found that paragraph 4.4 of the agreement was self-executing, and that the plaintiff was entitled to reduce his alimony and support payments without resort to an order of modification by the court. The court determined, however, that the separation agreement did not provide for the complete cessation of alimony payments in the circumstances, as the plaintiff continued to receive some compensation. The court determined that the plaintiff should have reduced his alimony and support payments to 40 percent of his pretax income, as

set forth in paragraph 4.4, and should not have stopped making alimony payments altogether. The court declined to find the plaintiff in wilful contempt.

Following oral argument, this court asked the trial court to articulate "the factual and legal bases for concluding, in the memorandum dated March 15, 2012, that the plaintiff was not in contempt for having ceased paying all alimony after July 1, 2009." The court explained that it had credited the plaintiff's testimony that he did not intend to violate the separation agreement and, rather, believed that his actions were in accordance with the agreement. The court further noted that the plaintiff took action to modify the order when it appeared that there was a dispute regarding the interpretation of the agreement.

The defendant argues that the court erred in denying her motion. She contends that nothing in the agreement permitted the plaintiff to stop making all alimony payments. Accordingly, she reasons that the plaintiff's conduct in so doing was clearly wilful. The defendant further argues that because the court erred in using only W-2 income to calculate the amount of arrearage and also failed to include direct benefits and the appropriate amount of distributions in its calculations, its findings as to contempt are likewise defective.

"[O]ur analysis of a judgment of contempt consists of two levels of inquiry. First, we must resolve the threshold question of whether the underlying order constituted a court order that was sufficiently clear and unambiguous so as to support a judgment of contempt. . . . This is a legal inquiry subject to de novo review. . . . Second, if we conclude that the underlying court order was sufficiently clear and unambiguous, we must then determine whether the trial court abused its discretion in issuing, or refusing to issue, a judgment of contempt, which includes a review of the trial court's determination of whether the violation was wilful or excused by a good faith dispute or misunderstanding." (Internal quotation marks omitted.) *Buehler* v. *Buehler*, 138 Conn. App. 63, 72, 50 A.3d 372 (2012).

"The abuse of discretion standard applies to a trial court's decision on a motion for contempt. . . . A finding of contempt is a question of fact, and our standard of review is to determine whether the court abused its discretion in [finding] that the actions or inactions of the [party] were in contempt of a court order. . . . To constitute contempt, a party's conduct must be wilful. . . . Noncompliance alone will not support a judgment of contempt. . . . We review the court's factual findings in the context of a motion for contempt to determine whether they are clearly erroneous. . . . A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake

has been made." (Internal quotation marks omitted.) *Oldani* v. *Oldani*, 132 Conn. App. 609, 625–26, 34 A.3d 407 (2011).

"In a civil contempt proceeding, the movant has the burden of establishing, by a preponderance of the evidence, the existence of a court order and noncompliance with that order." *Statewide Grievance Committee* v. *Zadora*, 62 Conn. App. 828, 832, 772 A.2d 681 (2001). "[I]nability to pay is a defense to a contempt motion. However, the burden of proving inability to pay rests upon the obligor." (Internal quotation marks omitted.) *Ahmadi* v. *Ahmadi*, 294 Conn. 384, 397, 985 A.2d 319 (2009).

The court found the agreement to be clear and to require the plaintiff to pay in alimony 40 percent of his W-2 income. The court articulated that it nonetheless had found that the defendant's conduct was not wilful. The court stated that it had credited the plaintiff's testimony that he had not intended to violate the separation agreement, but rather believed that his actions were in accordance with the agreement. The court did not abuse its discretion in determining that the plaintiff's violation involved a good faith misunderstanding of the agreement; see *In re Leah S.*, 284 Conn. 685, 693–94, 935 A.2d 1021 (2007); even though the order was objectively clear.

As stated in part I B of this opinion, the agreement is ambiguous as to whether and to what extent K-1 income properly was to be factored into the calculation of alimony. Although we remand the case for further proceedings on this limited issue, we discern no basis on which to disturb the court's conclusions regarding contempt. The court's failure to find wilfulness—an issue on which the defendant had the burden of proof— would not logically be altered on remand. Factors such as whether the plaintiff did not have the ability to pay at the time or whether he misunderstood the obligation in good faith would not be different at the time of remand.

B

The defendant next claims that the court erred in failing to award her counsel fees pursuant to General Statutes § 46b-87, which provides in relevant part that "[w]hen any person is found in contempt of an order of the Superior Court . . . the court may award to the petitioner a reasonable attorney's fee . . . ." Because we affirm the court's finding regarding contempt, we also affirm on the issue of attorney's fees.

IV

The defendant next claims that the court erred in failing to award statutory interest under General Statutes § 37-3a. We are not persuaded.

Our review of a trial court's determination regarding

whether to award statutory interest is governed by the abuse of discretion standard. See *Maloney* v. *PCRE, LLC*, 68 Conn. App. 727, 755–56, 793 A.2d 1118 (2002).

"[T]here is no right to recover interest in a civil action unless a statute provides for interest." (Internal quotation marks omitted.) *Nation Electrical Contracting, LLC* v. *St. Dimitrie Romanian Orthodox Church*, 144 Conn. App. 808, 820, 74 A.3d 474 (2013). Section 37-3a provides in relevant part that "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable. . . ." "[T]he primary purpose of § 37-3a . . . is not to punish persons who have detained money owed to others in bad faith but, rather, to compensate parties that have been deprived of the use of their money." *Sosin* v. *Sosin*, 300 Conn. 205, 230, 14 A.3d 307 (2011).

"[T]he court's determination [as to whether interest should be awarded under § 37-3a] should be made in view of the demands of justice rather than through the application of any arbitrary rule. . . . Whether interest may be awarded depends on whether the money involved is payable . . . and whether the detention of the money is or is not wrongful under the circumstances. . . . [W]e have construed [§ 37-3a] to make the allowance of interest depend [on] whether the detention of the money is or is not wrongful under the circumstances." (Citations omitted; internal quotation marks omitted.) Id., 229. "Although bad faith is one factor that the court may look at when deciding whether to award interest under § 37-3a . . . in the context of the statute, wrongful is not synonymous with bad faith conduct. Rather, wrongful means simply that the act is performed without the legal right to do so." (Internal quotation marks omitted.) *Ferrato* v. *Webster Bank*, 67 Conn. App. 588, 596, 789 A.2d 472, cert. denied, 259 Conn. 930, 793 A.2d 1084 (2002).

"The trier of fact may award prejudgment interest, as an element of damages, for the detention of money after it becomes payable if equitable considerations deem that such interest is warranted. . . . An award of such interest is an equitable determination lying within the trier's sound discretion. . . . The determination is one to be made in view of the demands of justice rather than through the application of an arbitrary rule. . . . A trial court must make two determinations when awarding compensatory interest under § 37-3a: (1) whether the party against whom interest is sought has wrongfully detained money due the other party; and (2) the date upon which the wrongful detention began in order to determine the time from which interest should be calculated. . . . A plaintiff's burden of demonstrating that the retention of money is wrongful requires more than demonstrating that the opposing party detained money when it should not have done

so. The fact that an award of such interest is discretionary and subject to equitable considerations, rather than automatic, reflects the reality that not all improper detentions of money are wrongful." (Citation omitted; internal quotation marks omitted.) *Smithfield Associates, LLC* v. *Tolland Bank*, 86 Conn. App. 14, 26, 860 A.2d 738 (2004), cert. denied, 273 Conn. 901, 867 A.2d 839 (2005).

The defendant argues that the plaintiff's detention of alimony and support payments was "wrongful," and that the court's failure to so find was influenced by its perhaps erroneous calculation of the amount of arrearage due and its finding that the plaintiff was not in wilful contempt, which, according to the defendant, was erroneous. The explanation advanced by the defendant for the court's failure to award statutory interest is speculative. The court summarily stated that it declined to impose statutory interest on the amount of alimony owed by the plaintiff.[6] We could only speculate as to what equitable considerations informed the court's decision. "In the absence of an adequate record, we presume that the trial court, in rendering its judgment undertook the proper analysis of the law and the facts." *Rollar Construction & Demolition, Inc.* v. *Granite Rock Associates, LLC*, 94 Conn. App. 125, 134, 891 A.2d 133 (2006). We do not conclude that the court abused its discretion in declining to award statutory interest.

V

The defendant last claims that the court erred in granting the plaintiff's motion to modify alimony. We agree.

Paragraph 4.6 of the separation agreement provides: "Either party shall have the right to move for modification of the provisions of paragraphs 4.1, 4.2 and 4.3 in the event there is a substantial change in the nature of the [plaintiff's] compensation and/or the [plaintiff] is no longer employed by Artisans Home Builders, Inc. and/or no longer has an ownership interest in Artisans Home Builders, Inc. Either party shall have the right to move for modification of the provisions of paragraphs 4.1, 4.2 and 4.3 based on a showing of a substantial change in the circumstances of either party as provided in Connecticut General Statutes § 46b-86 (a)."[7]

Our review of a trial court's granting or denial of a motion for modification of alimony is governed by the abuse of discretion standard. *Jansen* v. *Jansen*, 136 Conn. App. 210, 223, 46 A.3d 201, cert. denied, 306 Conn. 902, 52 A.3d 729 (2012). "To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous." (Internal quotation marks omitted.) *Nicholson* v. *Nicholson*, 66 Conn. App. 885, 887, 786 A.2d 462 (2001).

Claiming a change in the incomes of the parties, the plaintiff moved to modify the terms of the agreement,

pursuant to paragraph 4.6, in order that he would be liable to pay less alimony. The court made the following relevant factual findings. The plaintiff's income was $192,000 in 2007, $127,591 in 2008, and $72,000 in 2009 and 2010, respectively. The defendant earned $44,680 in 2009, approximately $14,000 of which was alimony received. In 2010, she returned to full-time employment and earned $100,000, and she was expected to earn similar amounts subsequently. Because the plaintiff's earnings had decreased by more than 60 percent, the court concluded that there had been a substantial change in the plaintiff's income. The court further found that the defendant had returned to full-time employment and that her earnings exceeded those of the plaintiff. In light of the current income disparity between the parties, the court granted the plaintiff's motion for modification and reduced alimony payments pursuant to paragraph 4.6 to $1 per year retroactive to the date of the modification motion, August 31, 2011.

The defendant argues that the court improperly granted the plaintiff's motion for modification because three of its underlying factual findings were clearly erroneous: (1) the plaintiff's income was $192,000 in 2007, $127,591 in 2008, and $72,000 in 2009 and 2010, respectively; (2) the plaintiff's income had decreased by more than 60 percent; and (3) after she returned to full-time employment, the defendant's earnings exceeded the plaintiff's by nearly $30,000. The defendant contends that "[f]or the year 2007, the court used as the plaintiff's income the presumptive amount under paragraph 4.2 of the agreement, being a total of $192,000, including the $17,000 in direct benefits and whatever amounts of W-2 income and subchapter S distributions were necessary to reach that $192,000 total. For 2008, however, the court only used the plaintiff's W-2 income, and did not include the direct benefits of $17,000 or the subchapter S distributions of $13,361. Similarly, for 2009, the court considered only the W-2 income of $72,000 and ignored the $17,447 in direct benefits that the plaintiff received. And for 2010 and 2011, the court ascribed only $72,000 in income to the plaintiff, despite the fact that his combined W-2 income, distributions and direct benefits totaled $178,079 in 2010 and the plaintiff suggested that his income in 2011 was similar. Had the court compared the plaintiff's income in those years as it actually was, instead of comparing the full $192,000 presumptive income in 2007 solely with the W-2 component in later years, it would have shown a far less dramatic reduction between 2007 and 2011 . . . ." (Footnote omitted.) The defendant further argues that the plaintiff's income did not decrease by more than 60 percent because (1) the 2007 income as found by the court included direct benefits and some K-1 distributions, while the court's findings as to income in the remaining years included only W-2 income; (2) the plaintiff controlled the amount of his

W-2 income and could increase or decrease it at will; and (3) the agreement provided that his annual income would be deemed to be at least $175,000 regardless of whether it consisted of W-2 income or K-1 income. The defendant also argues that the court's finding that the defendant's earnings exceeded the plaintiff's income by nearly $30,000 was based on a calculation of the defendant's income that included only W-2 income.

We agree with the defendant. The court erred in comparing "apples and oranges" and determining the amount of the plaintiff's compensation for 2007 through 2011, and calculating a 60 percent change in income by comparing the stipulated income of $192,000 in 2007, which included direct benefits and some K-1 income, with the plaintiff's W-2 income only for the subsequent years. Paragraph 4.6 specifies that either party shall have the right to move for modification of in the event there is a "substantial change in the nature of the [plaintiff's] compensation . . . ." It is perhaps significant that the agreement uses the term "compensation," in paragraph 4.6, rather than "pre-tax income" or another term previously used in article 4. In any event, because the factual basis underlying the court's granting of the plaintiff's motion for modification is clearly erroneous, we remand this issue to the trial court for further proceedings.[8]

The judgment is reversed with respect to the granting of the plaintiff's motion to modify alimony and the calculation of the amount of the alimony arrearage owed by the plaintiff to the defendant and the case is remanded for further proceedings consistent with this opinion. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The agreement contains two different corporate names for the Artisans enterprise. The parties appear to make no distinction; we treat the enterprise as one business and refer to it simply as "Artisans."

[2] Paragraph 4.4 provided that the plaintiff immediately was to notify the defendant of a change in base salary and direct benefits. The court concluded that such notification had occurred.

[3] The plaintiff, however, argues that the court did not improperly exclude the $17,000 in direct benefits from its calculation of arrearage.

[4] According to the defendant, the agreement contemplated that reasonable compensation for services was, as established by accountants, $175,000 annually, and the labeling of the amounts received by the plaintiff was somewhat discretionary. If the total of W-2 income and K-1 distributions was less than $175,000, then the amount of alimony and support would be derived from the actual amount received. If the W-2 amount equaled or exceeded $175,000, then alimony and support would be calculated from only the W-2 amount. Additionally, if the W-2 amount was less than $175,000, but the addition of a portion of the K-1 distributions would create the sum of $175,000, then alimony and child support would be based on $175,000—plus, of course, the $17,000 of direct benefits.

[5] Paragraph 4.2 provides that commencing June 1, 2007, the plaintiff shall pay unallocated alimony and child support. The amount of alimony and child support was based, in part, on an appraisal that determined that "reasonable and appropriate compensation levels" of the plaintiff for the year ended on December 31, 2005, was $175,000.

[6] Although the court found that the agreement did not allow the plaintiff to stop alimony payments, this finding is not necessarily inconsistent with its declining to award statutory interest because awards of statutory interest are subject to equitable considerations that reflect the reality that not all

improper detentions of money are wrongful. See *Smithfield Associates, LLC* v. *Tolland Bank*, supra, 86 Conn. App. 26. Furthermore, the plaintiff makes no argument that these findings are inconsistent.

[7] General Statutes § 46b-86 (a) provides in relevant part: "Unless and to the extent that the decree precludes modification, any final order for the periodic payment of permanent alimony or support . . . may, at any time thereafter, be . . . modified by the court upon a showing of a substantial change in the circumstances of either party . . . ."

[8] The defendant further argues that the court failed to consider the factors set forth in General Statutes § 46b-82. Because we remand the issue to the trial court for further proceedings, we need not address this issue. We do note, however, that "[o]nce a party has met his or her burden under either § 46b-86 (a) or (b), the court then should apply the factors of § 46b-82 to fashion a new alimony award." (Internal quotation marks omitted.) *Dan* v. *Dan*, 137 Conn. App. 728, 732–33, 49 A.3d 298, cert. granted on other grounds, 307 Conn. 924, 55 A.3d 565 (2012).

---