******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

FELICIA PIEROT BRODY *v.* CARY BRODY
(SC 19037)

Rogers, C. J., and Palmer, Zarella, Eveleigh and Robinson, Js.

*Argued September 15, 2014—officially released January 13, 2015*

*Kenneth J. Bartschi*, with whom were *Brendon P. Levesque*, and, on the brief, *M. Caitlin S. Anderson*, for the appellant (defendant).

*Gary I. Cohen*, for the appellee (plaintiff).

*Opinion*

ROBINSON, J. The defendant, Cary Brody, appeals, upon our grant of his petition for certification,[1] from the judgment of the Appellate Court affirming the judgment of the trial court dissolving his marriage to the plaintiff, Felicia Pierot Brody, and awarding her a $2.5 million lump sum alimony payment, and likewise affirming the trial court's postjudgment order finding the defendant in contempt for failing to turn over certain property to a third party bailee. *Brody* v. *Brody*, 136 Conn. App. 773, 776, 51 A.3d 1121 (2012). On appeal, the defendant claims that the Appellate Court improperly concluded that: (1) the alimony award was not based on a finding that he had committed adultery; (2) the alimony award did not violate the parties' prior written stipulation releasing the defendant from "any and all claims" arising from certain financial misconduct he allegedly committed during the marriage; and (3) a preponderance of the evidence standard of proof governs indirect civil contempt proceedings.[2] We disagree with the defendant's claims challenging the Appellate Court's decision to uphold the trial court's alimony award, but agree with his claim regarding the standard of proof governing indirect civil contempt proceedings. Specifically, we conclude that the defendant is entitled to a new hearing with respect to the trial court's April 28, 2011 postjudgment order because findings of indirect civil contempt must be supported by clear and convincing evidence. Accordingly, we affirm in part and reverse in part the judgment of the Appellate Court.

The Appellate Court's opinion aptly sets forth the following relevant facts and procedural history. "The parties met in 1997 and started dating shortly thereafter. . . . [I]n 1998, [the defendant] started his own hedge fund, named Colonial Fund, LLC (fund). The plaintiff assisted the defendant in establishing the fund, making an initial investment of $250,000 . . . [and] loaning the fund $600,000 for working capital . . . .

"In April, 2000, the parties decided to marry. . . . At the time of their marriage, the defendant's net worth was approximately $46 million and the plaintiff's net worth was approximately $29 million. . . . Their first child was born in September, 2002. . . .

"The parties enjoyed a comfortable lifestyle fueled by the defendant's successes at work, and they had a second child. Between 2003 and 2004, the plaintiff made investments totaling $2,650,000 in the fund on behalf of herself and her children.

"During this time, however, the parties began discussing what the plaintiff perceived as the excessive spending of the defendant. Between 2005 and 2008, the plaintiff expressed to the defendant her unhappiness with his purchases of two airplanes, a wine cellar costing in excess of $100,000 and Ferrari automobiles. The

defendant was drinking alcoholic beverages more than he had earlier in the marriage, and he was becoming verbally abusive of the plaintiff. From 2007 to 2008, the defendant continued to be verbally abusive of the plaintiff and started to become aggressive sexually with her. The plaintiff made it clear to the defendant that she was unhappy with his behavior, but the defendant was unreceptive to her concerns.

"Unknown to the plaintiff, the defendant's income had started to decline in 2005. In 2007, the defendant's partner in the fund called the plaintiff to inform her of significant losses in the fund and of hidden trades engaged in by the defendant. In October, 2007, the plaintiff learned, when it was announced publicly, that the Securities and Exchange Commission was prosecuting the fund and the defendant personally. The defendant had been aware of this investigation since July, 2003, but he had not told the plaintiff about it. The defendant assured the plaintiff that she did not have to worry, and the plaintiff continued to support the defendant. In May, 2008, the defendant accepted delivery of a new Ferrari." Id., 776–78.

The record further reveals that, in May, 2008, the plaintiff first learned that the fund was freezing its investor accounts in order "to ensure that [it] held enough in its reserves to meet the potential . . . litigation expense." This freeze prevented investors, like the plaintiff, from receiving more than 30 percent of their balances. Meanwhile, as the managing member of the fund, "the defendant redeemed money of his own funds without any apparent holdback." The plaintiff would later bring a demand for arbitration against the fund and the defendant personally, claiming that their misfeasance jeopardized her investments.

"In June, 2008, the plaintiff discovered unused condoms in the defendant's toiletries bag when he returned from a five day trip to California. According to the [plaintiff] . . . the defendant had not used condoms in the marriage for the past three years. . . . [The defendant asserted] that he used the condoms in the marriage when his sexually transmitted disease was active and that he used the condoms for comfort when he had ingrown hairs." *Brody* v. *Brody*, supra, 136 Conn. App. 779–80.

"The defendant was served with divorce papers on July 1, 2008. . . . In a memorandum of decision issued March 12, 2010, the court, *Munro, J.*, ordered, among other things, the dissolution of the parties' marriage. In connection with the dissolution judgment, the court ordered the defendant to pay the plaintiff $2,500,000 in lump sum alimony . . . ." (Footnote omitted.) Id., 779. Before the trial court's judgment was rendered in this dissolution action, the parties had entered into a separate settlement agreement regarding the alleged mishandling of the fund.

Subsequently, on November 29, 2010, the trial court, *Munro, J.*, issued a remedial order requiring the defendant to, inter alia, inventory his watch collection and then turn all of the watches over to a third party bailee as security for amounts owed to the plaintiff.[3] The plaintiff filed a postjudgment motion for contempt on January 27, 2011, alleging that, while she was picking up the children from the defendant's home a few days prior, she had observed him wearing a valuable watch. After hearing conflicting testimony regarding this encounter, the court, *Wenzel, J.*, issued an order dated April 28, 2011, which found the defendant in contempt for failing to comply with Judge Munro's remedial order. In making this contempt finding, Judge Wenzel applied a preponderance of the evidence standard of proof.

The defendant appealed from the trial court's dissolution judgment and postjudgment orders to the Appellate Court. With respect to the issues that are the subject of this certified appeal,[4] the Appellate Court rejected the defendant's claims that the trial court improperly: (1) based its alimony award on a finding that the defendant committed adultery; id., 783; (2) based its alimony award on conduct that was subject to a prior written stipulation between the parties; id., 787; and (3) applied a preponderance of the evidence standard of proof to the indirect civil contempt proceeding. Id., 801. This certified appeal followed. See footnote 1 of this opinion. Additional relevant facts and procedural history will be provided as necessary.

## I

### ALIMONY AWARD

We pause to underscore that "a judgment in a complicated dissolution case is a carefully crafted mosaic," which this court is reluctant to disturb without adequate cause. (Internal quotation marks omitted.) *Grimm* v. *Grimm*, 276 Conn. 377, 386, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006). "As we have repeatedly noted, trial courts have a distinct advantage over an appellate court in dealing with domestic relations, where all of the surrounding circumstances and the appearance and attitude of the parties are so significant." (Internal quotation marks omitted.) *Hardisty* v. *Hardisty*, 183 Conn. 253, 260, 439 A.2d 307 (1981). "In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 366–67, 999 A.2d 721 (2010).

### A

### Adultery Finding

We begin with the defendant's claim that the Appellate Court improperly concluded that the trial court's

alimony award was not based on a finding that he had committed adultery. The defendant contends that the trial court *did* make an adultery finding against him, "explicitly and repetitively," and improperly awarded the plaintiff alimony on that basis because the evidence of adultery was insufficient. In support of his argument, the defendant directs our attention to four specific passages in the trial court's memorandum of decision. The first such passage is the following: "The court finds that the presence of condoms in [the defendant's toiletries bag] was a sufficient basis for the plaintiff to presume he was unfaithful to her. Further, the court having found him not credible on this regarding a substantial statutory factor, cause of the breakdown of the marriage, which the court must consider in weighing alimony claims. Further, the court considers this lack of credibility a substantial adverse factor where it is weighing the differing testimony of the parties and credibility is an issue." In a second passage, the trial court stated that "[t]he marriage between the parties has broken down irretrievably, in large part because of the defendant's dishonesty, probable infidelity and his increasingly abusive behavior towards the plaintiff." Later, in a third passage, the trial court "[found] that the defendant [was] responsible for the breakdown of the marriage for conduct described herein." In a fourth passage, the trial court remarked that "[t]he sanctity of an oath of honesty is apparently of little importance to the defendant. The marital vow of fidelity proved no more binding on [him]." The defendant insists that these four passages clearly illustrate that the trial court made an adultery finding against him and, moreover, that the adultery finding had a material effect on the amount of alimony awarded to the plaintiff. The defendant argues that the Appellate Court improperly concluded otherwise and, further, that he is entitled to a new trial because the trial court's findings were not supported by sufficient evidence to satisfy the legal standard for adultery findings that was articulated in such cases as *Turgeon* v. *Turgeon*, 190 Conn. 269, 278–79, 460 A.2d 1260 (1983).

In response, the plaintiff argues that the Appellate Court properly concluded that the trial court did not actually find that the defendant committed adultery and, further, did not award her alimony on that particular basis. The plaintiff contends that the trial court's judgment instead was grounded in the defendant's "consistent lack of credibility." That is, the trial court identified the defendant's dishonesty "on a plethora of matters" as a significant cause of the marital breakdown. The plaintiff argues that this overall credibility problem led the trial court, in passing, to likewise question the veracity of defendant's proffered excuse regarding the condoms discovered in his toiletries bag. According to the plaintiff, however, the trial court did not take the additional step of making an affirmative infidelity finding. Turning to the four specific passages

cited by the defendant, the plaintiff responds that the trial court's language merely notes "[the plaintiff's] belief in the [defendant's] probable infidelity," without making such a finding for itself. The plaintiff then adds that "[t]here is nothing else . . . to support the claim of error that the court made the [defendant's] alleged infidelity a factor in the award of alimony." We agree with the plaintiff's broader view of the trial court's judgment—namely, that it actually dissolved this marriage due to irreconcilable differences, fueled in large part by the defendant's persistent lack of trustworthiness—and conclude that, to the extent that any subordinate passages regarding infidelity are ambiguous, they should be read in favor of upholding the trial court's alimony award.

Upon closer examination, we are unpersuaded by the defendant's argument that the four relevant passages from the trial court's memorandum of decision show that it made a conclusive finding of infidelity which, in turn, affected its alimony award. At best, the challenged language sends mixed signals. Consider, for example, the first passage: "The court finds that the presence of condoms in [the defendant's toiletries bag] was a sufficient basis for *the plaintiff* to presume he was unfaithful to her. Further, the court having found him not credible on this regarding a substantial statutory factor, cause of the breakdown of the marriage, which the court must consider in weighing alimony claims. Further, the court considers this lack of credibility a substantial adverse factor where it is weighing the differing testimony of the parties and credibility is an issue." (Emphasis added.) The introductory sentence acknowledges that an evidentiary basis exists for the plaintiff's subjective belief that the defendant was unfaithful to her. The middle sentence is either incomplete or in need of grammatical reconstruction. The concluding sentence is somewhat circular, but speaks to the trial court's general view that the defendant lacked credibility. Taken individually and together, the sentences within the first disputed passage are thus, to quote the defendant, "obliqu[e]" on the issue of whether an infidelity finding was actually made and whether such a finding would have affected the trial court's alimony award. Contrary to the defendant's arguments, this passage is reasonably read as being consistent with the trial court attributing the breakdown of this marriage to the defendant's overall issues concerning trustworthiness. The second and third passages are similarly inconclusive. The fourth passage amounts to judicial admonishment, but not a clear factual finding—much less one that was used in calculating alimony.

Importantly, the four passages invoked by the defendant should not be read in isolation, absent the overall context of the trial court's memorandum of decision. See *In re Jason R.*, 306 Conn. 438, 453, 51 A.3d 334 (2012) ("an opinion must be read as a whole, without

particular portions read in isolation, to discern the parameters of its holding" [internal quotation marks omitted]). This is especially necessary given the considerable breadth and depth of the memorandum, which, without accounting for the accompanying financial orders, spans thirty-eight pages. Upon a full review of the memorandum, the fleeting mentions of infidelity are eclipsed by the trial court's flood of findings that the defendant acted dishonestly. To provide a demonstrative, but nonexhaustive list, we observe here that the trial court determined that the defendant: (1) lied under oath about taking the plaintiff's jewelry during the pendency of a prior dissolution action—which was withdrawn after the parties reconciled; (2) concealed his troubles at work and declining income from the plaintiff, despite her expressed concerns; and (3) was not forthcoming about a multitude of financial matters, both before and after the present dissolution action commenced. This rampant dishonesty was identified by the trial court as a driving cause of the marital breakdown, and is amply supported by the record. Indeed, the trial court expressly dissolved the marriage because it had broken down irretrievably, and not because of adultery. See General Statutes § 46b-40 (c) ("[a] decree of dissolution of a marriage . . . shall be granted upon a finding that one of the following causes has occurred: [1] [t]he marriage has broken down irretrievably . . . [3] adultery").

Having fully considered the defendant's claim, we decline his invitation to engage in syntactic exercises with the four isolated and ambiguous passages and, instead, read them to support the trial court's alimony award.[5] See *D'Ascanio* v. *Toyota Industries Corp.*, 309 Conn. 663, 686, 72 A.3d 1019 (2013) (*McDonald, J.*, concurring) (ambiguous statements read in light most favorable to sustaining trial court decision); *In re Jason R.*, supra, 306 Conn. 453 ("[w]e read an ambiguous trial court record so as to support, rather than contradict, its judgment" [internal quotation marks omitted]). This approach is consistent with our more holistic reading of the trial court's memorandum of decision, which was replete with findings that the defendant generally lacked credibility and, in turn, was responsible for the irretrievable breakdown of the marriage. Moreover, this comports with our well established principles according due deference to complex dissolution judgments. See, e.g., *Grimm* v. *Grimm*, supra, 276 Conn. 386. Accordingly, we conclude that the Appellate Court properly determined that the trial court's alimony award was not based on a finding that the defendant had committed adultery.

## B

### Prior Written Stipulation

We next turn to the defendant's claim that the Appellate Court improperly concluded that the trial court did

not improperly award alimony based on conduct that had been subject to a prior written stipulation between the parties. Specifically, the defendant argues that, as part of an arbitration settlement, the plaintiff released " '*any* and *all* claims' arising from her investment in the [fund]." (Emphasis added.) The defendant emphasizes that the release in question broadly encompasses "any and all claims" relating to the fund, and was not limited to the arbitration context, "as so easily could have been done . . . ." Citing, for example, *Felton* v. *Felton*, 123 Conn. 564, 196 A. 791 (1938), the defendant contends that "[a] demand for alimony is a 'claim,' " and that "the trial court subsequently held that [the] plaintiff had not released a claim for *alimony* based on the *identical* allegations of misconduct involving [the] plaintiff's [fund] investments." (Emphasis in original.) This was improper, the defendant argues, because "[t]he trial court was not at liberty to compensate [the plaintiff] . . . in connection with her investment in [the fund]."

In response, the plaintiff agrees that she released, by written stipulation, " 'any and all claims' arising out of [her] investment in the fund in consideration of . . . being paid what was due" from her fund accounts. The plaintiff contends, however, that the released arbitration claims arose from the defendant's "mismanagement and failure to return . . . funds, as a matter of contract and property law." She argues that those claims were "clearly independent of [her] claim for dissolution of the marriage" and "for alimony and child support . . . ." (Emphasis omitted.) Put differently, she contends that the stipulation "was a *property release* relating to a *nonmarital* right." (Emphasis in original.) The trial court was aware of the distinction, the plaintiff argues, as evidenced by its refusal to award her any attorney's fees in connection with her pursuit of the fund related arbitration. The plaintiff contends that all of this is consistent with the concept that "[t]he alimony award is not a property right that compensates the payee for a lost property right or claim; it is compensation for the loss of spousal support." We agree with the plaintiff and conclude that the parties' prior written settlement did not preclude the trial court from considering the plaintiff's investment in the fund when fashioning the alimony award.

"Trial courts . . . are afforded wide discretion in awarding alimony, provided that they consider all of the criteria enumerated in General Statutes § 46b-82."[6] *Greco* v. *Greco*, 275 Conn. 348, 360, 880 A.2d 872 (2005). "The generally accepted purpose of . . . alimony is to enable a spouse who is disadvantaged through divorce to enjoy a standard of living commensurate with the standard of living during marriage." 24A Am. Jur. 2d 117, Divorce and Separation § 662 (2008). "A decree for the payment of alimony, therefore, does not constitute: (1) a debt in the traditional sense; (2) a decree for the payment of damages; or (3) a decree for the imposition

of a penalty." (Footnote omitted.) Id., § 573, pp. 24-25; see also *Greco* v. *Greco*, supra, 361 ("alimony is not designed to punish, but to ensure that the former spouse receives adequate support"). "Although in a dissolution action, the trial court must consider the conduct of the parties, the judgment in a dissolution action does not provide direct compensation as such to a party for injuries suffered during the marriage." *Delahunty* v. *Massachusetts Mutual Life Ins. Co.*, 236 Conn. 582, 593, 674 A.2d 1290 (1996).

Turning our attention to the settlement stipulation, we first observe that "a stipulation is considered a contract" and that a "determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]." (Internal quotation marks omitted.) *Ahmadi* v. *Ahmadi*, 294 Conn. 384, 390, 985 A.2d 319 (2009). The parties' stipulation states: "[The] plaintiff hereby releases . . . [the fund and the defendant] from any and all claims arising out of [the] plaintiff's investment in [the fund] prior to July 17, 2009." We conclude that nothing in this language would constrain the trial court's equitable discretion with respect to alimony. The settlement merely released the defendant from the plaintiff's threatened claims for *damages* in connection with the fund. As observed, the nature of alimony is categorically distinct from damages, in that it is a forward-looking means of providing economic support for a former spouse. Cf. *Delahunty* v. *Massachusetts Mutual Life Ins. Co.*, supra, 236 Conn. 592 ("[a] tort action, the purpose of which is to redress a legal wrong by an award of damages, is not based on the same underlying claim as an action for dissolution, the purpose of which is to sever the marital relationship, to fix the rights of the parties with respect to alimony and child support, and to divide the marital estate").

Moreover, following a discussion of the fund controversy, the trial court in the present action expressly found "that the plaintiff fully released the defendant from any claims arising out of her ownership in the fund in their settlement agreement." The trial court went on to distinguish the truly unique function of an alimony claim from that of an ordinary claim, finding "that the defendant did engage in conduct that jeopardized the ability of the plaintiff to realize her assets. While this cannot result in an order granting her reimbursement of [arbitration related] attorney's fees . . . it must be factored in by the court in the consideration of alimony (falling within the [statutory] factors) . . . ." This illustrates that the trial court's discussion of the plaintiff's jeopardized assets was appropriately linked to a statutory factor under § 46b-82 (a) used to determine her alimony award, namely, her amount and sources of income. The trial court, beyond being vested with broad discretionary powers to fashion the alimony award generally, had a specific statutory imperative under § 46b-82 (a) to consider the plaintiff's reduced

income sources—regardless of whether the reduction was attributable to the defendant or someone else. See *Greco* v. *Greco*, supra, 275 Conn. 360; see also General Statutes (Supp. 2014) § 46b-82 (a) ("[i]n determining whether alimony shall be awarded, and the duration and amount of the award, the court shall consider . . . amount and sources of income"). Accordingly, we conclude that the Appellate Court properly upheld the decision of the trial court to fashion the alimony award on this basis.

## II

### INDIRECT CIVIL CONTEMPT PROCEEDING

We now turn to the defendant's claim that the Appellate Court improperly concluded that Judge Wenzel properly applied a preponderance of the evidence standard of proof to his indirect civil contempt proceeding. The defendant acknowledges that certain Appellate Court cases indicate that civil contempt should be proven by a preponderance of the evidence; e.g., *Gravius* v. *Klein*, 123 Conn. App. 743, 749, 3 A.3d 950 (2010); but argues that this court should use the present appeal as an opportunity to hold that civil contempt must instead be proven by " 'clear and convincing evidence . . . .' " The defendant argues that this heightened standard of proof is appropriate because civil contempt proceedings: (1) are quasi-criminal and carry the threat of incarceration if there is a compliance failure; (2) may have important collateral consequences; and (3) are governed by the clear and convincing evidence standard in a majority of other jurisdictions, including the federal system.

In response, the plaintiff does not appear to challenge substantively the defendant's three proffered reasons for changing the law to require a heightened standard of proof for civil contempt proceedings. Rather, the plaintiff contends that the Appellate Court's decision is consistent with Connecticut case law—citing cases in which the Appellate Court determined that a preponderance standard should govern civil contempt proceedings; e.g., *Dickinson* v. *Dickinson*, 143 Conn. App. 184, 189, 68 A.3d 182 (2013); *Campbell* v. *Campbell*, 120 Conn. App. 760, 767, 993 A.2d 984 (2010); as well as cases in which this court determined that a rather amorphous "sufficient proof" standard should govern *indirect* civil contempt proceedings more specifically. E.g., *Cologne* v. *Westfarms Associates*, 197 Conn. 141, 151–52, 496 A.2d 476 (1985); *Potter* v. *Board of Selectmen*, 174 Conn. 195, 197, 384 A.2d 369 (1978). The plaintiff goes on to argue that, even if this court does adopt a clear and convincing evidence standard, that heightened standard would be met here. We disagree, and adopt the clear and convincing evidence standard of proof for indirect civil contempt proceedings. We further conclude that a new contempt hearing is required with regard to the incident underlying the trial court's

April 28, 2011 postjudgment order.

"As we have often recognized, contempts may be characterized as civil or as criminal." *Cologne* v. *Westfarms Associates*, supra, 197 Conn. 149. "[A] court's power to hold a party in civil or criminal contempt is not limited by the nature of the offense. Rather, it is the nature of the relief itself that is instructive in determining whether a contempt is civil or criminal. A contempt fine is civil if it either coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained." (Internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 489, 499, 970 A.2d 570 (2009). "Contempts of court may also be classified as either direct or indirect, the test being whether the contempt is offered within or outside the presence of the court. . . . A refusal to comply with an injunctive decree is an indirect contempt of court because it occurs outside the presence of the trial court." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Cologne* v. *Westfarms Associates*, supra, 150.

In the present appeal, neither party challenges the Appellate Court's characterization of the contempt finding as civil and indirect in nature. See *Brody* v. *Brody*, supra, 136 Conn. App. 801. In any event, the underlying trial court order was inarguably injunctive because it directed the defendant to, inter alia, inventory his watch collection and then turn all of the watches over to a third-party bailee as security for amounts owed to the plaintiff. A compliance failure associated with this order would constitute indirect civil contempt. We therefore proceed to the narrow question of what standard of proof should govern indirect civil contempt proceedings.

In *Cologne* v. *Westfarms Associates*, supra, 197 Conn. 150, this court recognized "that there are constitutional safeguards that must be satisfied in indirect contempt cases. It is beyond question that due process of law . . . requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation." (Internal quotation marks omitted.) The due process requirements articulated in *Cologne* continue to be instructive. See also *New Hartford* v. *Connecticut Resources Recovery Authority*, supra, 291 Conn. 500–501 (notice deficiency in indirect civil contempt proceeding).

In *Cologne*, this court further broached the topic of which standard of proof is most appropriate for indirect civil contempt proceedings. In surveying the historic common law, it determined that "in the absence of

an admission of contempt, [such a finding] had to be prove[n] by sufficient competent evidence . . . ."[7] *Cologne* v. *Westfarms Associates*, supra, 197 Conn. 151. As applied to the action then at hand, the court concluded that the sufficient evidence standard was not met because the trial court relied "entirely upon unsworn statements of [a party's] counsel" to reach its contempt finding. Id., 154. We conclude that *Cologne*'s standard for indirect civil contempt proceedings warrants clarification, for indeed any claim must be proven by "sufficient" evidence—whether the overarching standard of proof requires a mere preponderance of evidence, clear or convincing evidence, or otherwise.[8]

Following a review of persuasive indirect civil contempt case law, we ultimately conclude that, under Connecticut law, such proceedings should be proven by clear and convincing evidence. This determination is aligned with the courts of our sister states; e.g., *In re Birchall*, 454 Mass. 837, 852–53, 913 N.E.2d 799 (2009); *Coventry* v. *Baird Properties, LLC*, 13 A.3d 614, 621 (R.I. 2011); as well as federal courts. E.g., *Southern New England Telephone Co.* v. *Global NAPs Inc.*, 624 F.3d 123, 145 (2d Cir. 2010); *Goya Foods, Inc.* v. *Wallack Management Co.*, 290 F.3d 63, 77 (1st Cir. 2002). This heightened standard of proof "adequately characterizes the level of certainty appropriate to justify civil contempt sanctions, especially when those sanctions may include incarceration." *In re Birchall*, supra, 852; see also General Statutes § 46b-87 (civil contempt finding may potentially lead to incarceration in certain family law matters). Moreover, within our state's existing legal framework for indirect civil contempt proceedings, a clear and convincing standard of proof is consistent with the threshold substantive requirement that the directives of the underlying court order be "clear and unambiguous." *In re Leah S.*, 284 Conn. 685, 693, 935 A.2d 1021 (2007). Our rigorous due process requirements for indirect civil contempt proceedings likewise demand a heightened evidentiary standard. See *Cologne* v. *Westfarms Associates*, supra, 197 Conn. 150. In sum, a civil contempt finding should not attach to an individual just because it is more likely than not that an injunction was disobeyed beyond the eyes of a court. Accordingly, we hold that the Appellate Court improperly concluded that a preponderance of the evidence standard of proof governs indirect civil contempt proceedings.

The plaintiff argues, however, that even if this court adopts a clear and convincing evidence standard for indirect civil contempt proceedings, the evidence in the present case would rise to meet that heightened standard of proof. She does not cite to any legal authority in support of her contention that, here, the improper application of a *lower* standard of proof by the trial court would be harmless error. We conclude that it is not the province of an appellate tribunal to make her requested evidentiary assessment in the first instance.

See *Brown* v. *Villano*, 49 Conn. App. 365, 369–70, 716 A.2d 111 (new hearing required where trial court improperly applied preponderance standard, rather than clear and convincing standard), cert. denied, 247 Conn. 904, 720 A.2d 513 (1998). This type of appellate abstention is especially appropriate in the present action, given that the trial court's contempt finding centered on conflicting testimony regarding the defendant's alleged possession of a watch. See *Schaffer* v. *Schaffer*, 187 Conn. 224, 227, 445 A.2d 589 (1982) ("[n]othing in our law is more elementary than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded their testimony" [internal quotation marks omitted]).

The judgment of the Appellate Court is reversed in part and the case is remanded to that court with direction to vacate the trial court's April 28, 2011 judgment of contempt and to remand the case to the trial court with direction to hold a new contempt hearing in accordance with this opinion; the judgment of the Appellate Court is affirmed in all other respects.

In this opinion the other justices concurred.

[1] We granted the defendant's petition for certification for appeal limited to the following issues: (1) "Did the Appellate Court properly determine that the trial court's judgment was not based upon a finding of adulterous conduct on the part of the defendant?"; (2) "Did the Appellate Court properly determine that a contractual release of 'any and all claims arising out of the plaintiff's investment in [Colonial Fund, LLC]' did not include the plaintiff's claims for alimony arising from the plaintiff's investment in Colonial Fund, LLC?"; and (3) "Did the Appellate Court properly determine that the standard of proof in civil contempt proceedings was the 'preponderance of the evidence' standard?" *Brody* v. *Brody*, 307 Conn. 910, 910–11, 53 A.3d 998 (2012).

[2] The defendant requests that we address a fourth claim relating to a postjudgment order of contempt by the trial court, *Munro, J.*, dated November 29, 2010. We decline to address the matter because it is outside the scope of the certified issues. See Practice Book § 84-9 ("[t]he issues which the appellant may present are limited to those raised in the petition for certification, except where the issues are further limited by the order granting certification"). Notably, the Appellate Court addressed the claim in question and the defendant failed to raise it in his petition for certification. See *Brody* v. *Brody*, supra, 136 Conn. App. 797–99. Moreover, we do not see any unique justification that would favor granting the defendant's belated request that we exercise our supervisory powers to consider the claim. Cf. *Ahneman* v. *Ahneman*, 243 Conn. 471, 481–82, 706 A.2d 960 (1998) (invoking supervisory powers to evaluate claim that was not certified, rather than remanding case to Appellate Court to consider for first time, because reaching merits of claim was beneficial as matter of judicial economy).

[3] The defendant challenges Judge Munro's November 29, 2010 remedial order. We do not, however, reach that claim. See footnote 2 of this opinion.

[4] The Appellate Court also rejected the defendant's other claims, namely, that the trial court improperly: (1) "used an award of alimony to effectuate an improper distribution of property in violation of the parties' prenuptial agreement"; (2) "calculated the alimony award on the basis of cash flow rather than available net income"; and (3) "found him in contempt on the basis of his compliance with a prior federal court order . . . ." *Brody* v. *Brody*, supra, 136 Conn. App. 776.

[5] Although the defendant filed a motion for articulation in this case on July 13, 2010, that motion did not request any clarification regarding the alleged infidelity finding. "[A]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decisions, thereby sharpening the issues on appeal." (Internal quotation marks omitted.) *Grimm* v. *Grimm*,

supra, 276 Conn. 389.

We acknowledge that Practice Book § 61-10 (b) provides in relevant part: "The failure of any party on appeal to seek articulation pursuant . . . shall not be the sole ground upon which the court *declines to review* any issue or claim on appeal. . . ." (Emphasis added.) Although a trial court articulation might have been helpful in the present case, this court has afforded meaningful review of the defendant's claim and concludes that his desired reading of the four passages contained in the trial court's memorandum of decision is myopic.

[6] General Statutes (Supp. 2014) § 46b-82 (a) provides in relevant part: "At the time of entering the decree, the Superior Court may order either of the parties to pay alimony to the other . . . .  In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall . . . consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81 . . . ."

We note that, although § 46b-82 was amended subsequent to the commencement of this dissolution action; see Public Acts 2013, No. 13-213, § 3; the changes enacted by the legislature are not relevant to the issues presently on appeal. Therefore, for convenience, we refer to the 2014 supplement of the statute.

[7] In *Cologne*, this court observed, however, "that in the federal system the burden of proof in civil contempt cases is the 'clear and convincing evidence' standard." *Cologne* v. *Westfarms Associates*, supra, 197 Conn. 152 n.11.

[8] We acknowledge that this vagary of *Cologne* may have led to a number of Appellate Court determinations that civil contempt findings should be proven by a preponderance of the evidence. E.g., *Dickinson* v. *Dickinson*, supra, 143 Conn. App. 189; *Oldani* v. *Oldani*, 132 Conn. App. 609, 626, 34 A.3d 407 (2011); *Gravius* v. *Klein*, supra, 123 Conn. App. 749; *Campbell* v. *Campbell*, supra, 120 Conn. App. 767; *Statewide Grievance Committee* v. *Zadora*, 62 Conn. App. 828, 832, 772 A.2d 681 (2001). Under the Appellate Court's well established policy, its three judge panel in this case was bound to apply such precedent. See, e.g., *Boccanfuso* v. *Conner*, 89 Conn. App. 260, 285 n.20, 873 A.2d 208 ("[T]his court's policy dictates that one panel should not, on its own, reverse the ruling of a previous panel. The reversal may be accomplished only if the appeal is heard en banc." [Internal quotation marks omitted.]), cert. denied, 275 Conn. 905, 882 A.2d 668 (2005).